ATTORNEY FOR APPELLANT
James J. Krajewski
Munster, Indiana

ATTORNEY FOR APPELLEE
Eugene M. Velazco, Jr.
Merrillville, Indiana

# In the
# Indiana Supreme Court

No. 45S03-0509-JV-435

ROBERT BESTER,

Appellant (Petitioner below),

v.

LAKE COUNTY OFFICE OF FAMILY
AND CHILDREN,

Appellee (Respondent below).

Appeal from the Lake Superior Court, No. 45D06-0211-JT-104
The Honorable Mary Beth Bonaventura, Senior Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 45A03-0410-JV-454

**December 20, 2005**

**Rucker, Justice.**

## Case Summary

The trial court terminated Robert Bester's parental rights on the ground that the parent-child relationship posed a threat to the well being of the child. The Court of Appeals affirmed. Concluding that the evidence does not clearly and convincingly demonstrate that Bester's parental rights should be terminated, we reverse the judgment of the trial court.

## Facts and Procedural History

On June 16, 2001, a son (referred to as "Child") was born out of wedlock to Lavita Israel (Mother) and Robert Bester (Father). Father was present at St. Catherine's Hospital at the time of Child's birth. Because Child tested positive for cocaine, Hospital authorities notified the Lake County Office of Family and Children Services ("OFC"), which assumed jurisdiction over Child. See Ind. Code § 31-34-2-3. Five days later OFC gave Hospital the authority to release Child to the temporary custody of foster parents. See Ind. Code § 31-34-4-4. Thereafter OFC filed a petition seeking that Child be declared a Child in Need of Services ("CHINS"). See Ind. Code § 31-34-9-1. On October 12, 2001, after a hearing at which Father appeared and Mother did not, the trial court entered an order granting the CHINS petition. The order included a case plan for reunification that provided in relevant part:

> Mother and alleged father to submit to psychological evaluations and follow through with recommended treatment. Mother and alleged father to submit to random drug screens. Mother and alleged father to successfully complete parenting classes. Mother and alleged father to visit with the child regularly. Mother to submit to a substance abuse evaluation and follow through with recommended treatment. Alleged father to become adjudicated.[1]

Appellant's App. at 89. Child remained in the custody of foster parents.

The record shows that even before the entry of the case plan Father was regularly visiting with Child. Pursuant to the plan the initial visits were supervised. However those visits were so successful that sometime in 2002 OFC permitted Father to exercise unsupervised weekend visits. Father was living with his own parents in East Hazel Crest, Illinois. Consequently, Child spent every weekend with his father, grandparents, and other relatives. A later home study described the living arrangements in part as follows:

---

[1] The record is silent on whether Mother or Father executed a paternity affidavit, see Indiana Code § 16-37-2-1.1, or whether either party filed a Petition to Establish Paternity, see Indiana Code § 31-14-2-1, et seq. In any event the record shows that Father was subsequently adjudicated Child's biological parent as the result of DNA testing.

> The house is situated in a private wooded area that consists of other single-family homes in good upkeep. Mr. Bester's parents have resided in the home for the past eight years.
>
> . . .
>
> The Bester home was observed to be clean, spacious and adequately furnished. The home is equipped with working smoke and carbon monoxide detectors. There were no hazards observed that would prevent the placement of [Child] into the home. The home is located in a private neighborhood and is near parks, schools and shopping.

Appellant's App. at 26-27. In addition to visiting with Child regularly, Father also complied with other requirements of the case plan, including submitting to psychological evaluations, random drug screens, and successfully completing parenting classes.

In October 2002, the OFC initiated a referral through the Interstate Compact on the Placement of Children requesting the State of Illinois to "study the home of Robert Bester [] for the possible placement of 1-year-old [Child]." Appellant's App. at 24.[2] The Illinois investigator assigned to the case completed a home study that "d[id] not approve the placement of [Child] with his father." Appellant's App. at 35. The study cited Father's history of arrests and convictions between 1994 and 2000, some of which involved controlled substances. The home

---

[2] The Interstate Compact on the Placement of Children, enacted in all fifty states, provides a mechanism by which children can be sent to new foster or adoptive homes across state lines. See Ind. Code § 12-17-8-1. It includes a reporting requirement that allows a receiving state to investigate the fitness of the proposed home and to determine whether the child may be placed according to a proposed plan. Id. Whether the ICPC applies to the interstate reunification of children with natural parents is an open question. Some jurisdictions have concluded the Compact does apply under those circumstances. See, e.g., Ariz. Dep't of Econ. Sec. v. Leonardo, 22 P.3d 513 (Ariz. 2001); Dep't of Children & Families v. Benway, 745 So.2d 437 (Fla. Dist. Ct. App. 1999); Adoption of Warren, 693 N.E.2d 1021 (Mass. App. Ct. 1998); K.D.G.L.B.P. v. Hinds County Dep't of Human Servs., 771 So.2d 907 (Miss. 2000); Matter of Tsapora Z., 195 A.D.2d 348 (N.Y. App. Div. 1993). State ex rel. Juvenile Dep't of Clackamas County v. Smith, 811 P.2d 145 (Or. Ct. App. 1991). Other jurisdictions have taken a contrary view concluding the ICPC does not apply. See McComb v. Wambaugh, 934 F.2d 474 (3rd Cir. 1991); Ark. Dep't of Human Servs. v. Huff, 65 S.W.3d 880 (Ark. 2002); In re Johnny S. v. Yvonne Q., 47 Cal. Rptr.2d 94 (Cal. Ct. App. 1995); Dep't of Children & Family Servs. v. L.G., 801 So.2d 1047 (Fla. Dist. Ct. App. 2001); Div. of Youth & Family Servs. v. K.F., 803 A.2d 721 (N.J. Super. Ct. App. Div. 2002). Neither the courts of review in Indiana nor in Illinois have addressed the question of whether the ICPC applies to the interstate reunification of a child with a natural parent. And we decline to do so today because neither party has placed the issue before us.

study concluded that Father needed to distance himself further from his past behavior before the State of Illinois could allow Child to live with him there.

For reasons not apparent from this record, before the home study was complete the OFC filed a petition to terminate the parental rights of both Mother and Father.[3]  After a hearing conducted on August 18, 2004, at which Father appeared and Mother did not, the trial court entered an order granting the petition.  The order provided in pertinent part:

> The child(ren) has been removed from his parent(s) for least [sic] six (6) months under a dispositional decree(s) of this Court dated October 12, 2001 to both parents retroactive to June 21, 2001 . . . .
>
> The child(ren) has been removed from the parent and has been under the supervision of the LCOFC for at least fifteen (15) of the most recent twenty-two (22) months.
>
> There is a reasonable probability that the conditions resulting in the removal of the child from his parents' home will not be remedied in that:  Lavita Israel, [sic] is mother of herein named child.  Child was born testing positive for cocaine.  Mother has two other children none of whom are living with her.  Mother admits using cocaine to relieve stress from her pregnancy and her relationship with the child's father.  Child was placed in foster care.  Child has failed to bond with mother.  Mother has since gotten pregnant again.

---

[3] The record shows that the petition was filed October 22, 2002.  Appellant's App. at 14.  An order authorizing the filing was entered November 8, 2002.  Appellant's App. at 7.  However, the home study was not complete until sometime in December.  In fact the in-home visit with Father and his parents did not occur until November 22, 2002, and a criminal background check was not received until December 4, 2002.  Appellant's App. at 25.  When asked who made the determination to change the case plan from uniting Child with Father, a social worker assigned to the case testified "The Interstate Compact – the Illinois Interstate Compact Agreement worker or supervisor."  Tr. at 31.  On transfer OFC reiterates this view.  "As a result of the denial of placement by Illinois Interstate Compact, the case plan was changed from possible placement with the father to termination of parental rights."  Appellee's Br. In Response to Petition to Transfer at 4.  We make two observations.  First, recommendations contained in a home study conducted pursuant to the ICPC may have a bearing on whether a child can be placed in a home across state lines.  See n.2.  But simply because a home study concludes that placement across state lines is not recommended does not automatically mean that a parent's parental rights should be severed.  Second, we are at a loss to see how the home study could have played a role in the decision to file a petition to terminate Father's parental rights since it was not complete until nearly two months after the petition was filed.

4

Robert Bester [] is the father of [Child] as determined by DNA testing. Mr. Bester has made efforts to comply with the case plan for reunification. Ms. Israel has made little to no effort to comply with the child's case plan.

Neither parent is providing financial or emotional support for the child. Mother has had little contact with the child. Father has had regular contact with the child. Child has been in placement for over one year.

There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child in that: Child needs a stable loving, caring, nu[r]turing, and drug free and safe adoptive home. Child has been in placement since birth. Mother has made little to no effort in cooperating with the agency and case plan. Father has made some effort but has yet to establish himself as independent or to obtain his own residence. Father is employed and trying to obtain his GED. Father has extensive criminal convictions for drugs and cannot obtain approval from the State of Illinois to allow child to be placed with him.

It is in the best interest of the child and his health, welfare and future that the parent-child relationship between the child and his parents be forever fully and absolutely terminated.

Appellant's App. at 12-13. Father appealed, and in a memorandum decision the Court of Appeals affirmed. See Robert Bester v. Lake County Office of Family and Children, No. 45A03-0410-JV-454 (Ind. Ct. App. April 13, 2005). Having previously granted transfer, we now reverse the judgment of the trial court.[4]

## Discussion

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923). A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." Troxel v. Granville, 530 U.S. 57, 65 (2000). Indeed the parent-child

---

[4] Our determination in this regard applies to Father only. Mother did not contest the trial court's judgment and is not a party to this appeal.

5

relationship is "one of the most valued relationships in our culture." Neal v. DeKalb County Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003) (quoting Tillotson v. Clay County Dep't of Family & Children, 777 N.E.2d 741, 745 (Ind. Ct. App. 2002)). We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004). Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." Id.

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. Doe v. Daviess County Div. of Children & Family Servs., 669 N.E.2d 192, 194 (Ind. Ct. App. 1996). We consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Here, the trial court entered findings of fact and conclusions thereon in granting the OFC's petition to terminate Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. Page v. Greene County Dep't of Pub. Welfare, 564 N.E.2d 956, 959 (Ind. Ct. App. 1991). We will set aside the trial court's judgment only if it is clearly erroneous. In re Wardship of B.C., 441 N.E.2d 208, 211 (Ind. 1982). A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." In re the Matter of R.J., 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

Indiana Code § 31-35-2-4(b)(2) requires that a petition to terminate a parent-child relationship involving a child in need of services must allege that:

    (A)  one (1) of the following exists:
        (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree;
        (ii)  A court has entered a finding . . . that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
        (iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county

> > office of family and children for at least fifteen (15)
> > months of the most recent twenty-two (22) months;
>
> (B) there is a reasonable probability that:
> > (i) the conditions that resulted in the child's removal or the
> > reasons for placement outside the home of the parents
> > will not be remedied; or
> > (ii) the continuation of the parent-child relationship poses a
> > threat to the well-being of the child;
>
> (C) termination is in the best interests of the child; and
> (D) there is a satisfactory plan for the care and treatment of the
> child.

The OFC bears the burden of proving these allegations by clear and convincing evidence. In re the Matter of R.J., 829 N.E.2d at 1035. Clear and convincing evidence need not reveal that "the continued custody of the parents is wholly inadequate for the child's very survival." Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1233 (Ind. 1992). Rather, it is sufficient to show by clear and convincing evidence that "the child's emotional and physical development are threatened" by the respondent parent's custody. Id. at 1234.

Father raises several issues on transfer, one of which we find dispositive: whether the OFC presented clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Child's well-being.[5] Father contends that several of the trial court's findings in this regard apply only to Mother and that the findings that apply to him either (a) are not supported by the evidence or (b) do not support the trial court's ultimate conclusion.

As the trial court's findings reveal, the termination order focused primarily upon Mother's conduct and how her conduct affected Child. The only findings relevant to Father provide:

> Robert Bester [] is the father of [Child] as determined by DNA
> testing. Mr. Bester has made efforts to comply with the case plan
> for reunification. . . .

---

[5] The OFC is required to prove either (i) the conditions resulting in child's placement outside the home will not be remedied, or (ii) the continuation of the parent-child relationship poses a threat the child's well being. It need not prove both. Ind. Code § 31-35-2-4(b)(2); In re W.B., 772 N.E.2d 522, 531 (Ind. Ct. App. 2002) ("Having found a reasonable probability that the conditions precipitating the [children's] removal would not be remedied, the trial court was not required to find also that the continuation of the parent-child relationship posed a threat to the [children], since the statute only requires finding one or the other."). Here, the trial court terminated Father's parental rights only on grounds related to Child's well being.

> Neither parent is providing financial or emotional support for the child.
>
> Father has had regular contact with the child. . . .
>
> Father has made some effort but has yet to establish himself as independent or to obtain his own residence. Father is employed and trying to obtain his GED. Father has extensive criminal convictions for drugs and cannot obtain approval from the State of Illinois to allow child to be placed with him.

Appellant's App. at 12-13.

The trial court's finding that Father "has made *efforts* to comply with the case plan for reunification" is a bit misleading (emphasis added). From shortly after Child was born in June 2001, until August 2002, OFC case manager Rita Daniels was assigned to Child's case. At the termination hearing, when asked about her contact with Father and whether he was availing himself of court ordered services, Daniels testified, "Dad was involved in visitation, he was involved – there was supposed to be a home study done, and a background check done on him; various things that were listed and he was *one hundred percent compliant*." Tr. at 59 (emphasis added). Case manager Judith Kelley, who was assigned Child's case beginning in August 2002, confirmed that Father completed his counseling and visited with Child on a regular basis. Tr. at 41. The record supports both of the case managers' testimonies. Father underwent therapy with Apostolic Youth & Family Services, Inc. There was no evidence that follow-up treatment of any kind was recommended. Between June 21, 2002 and October 15, 2002 Father submitted to five random drug tests conducted by this same family services agency. Each showed Father tested negatively for either cocaine and "THC" or cocaine, "THC", and alcohol. Appellant's App. at 43, 50, 51, 78, 79. The record also shows that Father enrolled in and successfully completed a twelve-week parenting class with the agency "Ties The Bind" which included regular visitations with Child. Appellant's App. at 69-73; Tr. at 72.

The record shows that Father was in full compliance with the court ordered case plan for reunification which required him to (1) submit to psychological evaluations and follow through with any recommended treatment, (2) submit to random drug screens, (3) successfully complete

parenting classes, and (4) visit with the child regularly. Appellant's App. at 89. To say that Father merely made "efforts" to comply with plan is not supported by the record.

The trial court's finding that Father is not "providing financial . . . support for the child" is also misleading. Even though Father testified that he provided money to Child's foster parents as well as his own parents to help pay for his son's daycare, when asked the question, "[t]o your knowledge, has Mr. Bester contributed financially to this child in any form," case manager Kelly testified, "[n]ever, to my knowledge." Tr. at 28.[6] The trial court is vested with the responsibility of resolving this conflicting testimony. On review we do not reweigh evidence or judge witness credibility. Doe, 669 N.E.2d at 194. We are thus bound by the trial court's factual determination that Father is not providing financial support for Child. Nonetheless, the trial court's finding implies that Father was ordered to provide such support and failed to do so. But nothing in this record supports that implication. The record does not reveal whether an order of support was included as a part of the paternity adjudication. See n.1. And the case plan itself has no support obligation component. It is clear that Father complied in every respect with the court ordered case plan for reunification. Absent some indication that Father was directed to provide financial support to Child, he cannot now be criticized for not doing that which he was never asked to do.

The trial court found that "*[n]either* parent is providing . . . emotional support for the child." Appellant's App. at 13 (emphasis added). Although this may be true with respect to Mother—who has not contested the termination of her parental rights and is not a party to this appeal—there is simply nothing in the record that supports this finding with respect to Father. We first observe that none of the witnesses testifying at the termination hearing was specifically asked about the emotional support that Father was or was not providing to Child. More importantly the evidence introduced at the hearing that is at least related to this issue presents a different picture. The initial visitations between Father and Child were conducted under the supervision of the "Ties The Bind" agency. The reports of those visitations were introduced into evidence. Following is a representative sampling: August 6, 2001, "Lavita was a no show. Robert had a good visit with his baby. He held him close, he walked and talked to [Child]. He

---

[6] Apparently the case manager was unaware that Father provided Child with gifts as well clothing. See Appellant's App. at 54, 69.

9

hugged and kissed him. They also brought [Child] some clothing. They had a good visit." Appellant's App. at 69; August 27, 2001 "Lavita the mother [] was a no show. Robert visited with his son, he held him and rocked him and talked to him. Grandmother Carol was also here for the visit. They had a good visit with [Child]." Appellant's App. at 70; September 17, 2001 "Robert held [Child] and fed him. He changed his pampers; he rocked him; and talked to [Child]. Grandmother was giving Robert instructions and showing him the correct way to hold the baby and to make sure he burp[s] him. They had a good visit." Appellant's App. at 73; June 10, 2002 "Robert played with [Child]. He pushed him in the little push car. And his Aunt Tanzie took pictures of Robert and his son. Robert played with [Child] and fed him some applesauce. He also put [Child] on the floor mats and played with him. They had a good visit." Appellant's App. at 53; June 17, 2002, "Today was [Child's] birthday. He had a birthday party with cake, ice cream, party hats. Mrs. Bester [Grandmother] took lots of pictures along with [Child's] cousins, father, and aunt. They also brought [Child] some new clothing. Mrs. Bester [Grandmother] and the family was very happy." Appellant's App. at 54. In essence, the evidence does not support the trial court's findings. Far from demonstrating that Father provides no emotional support to Child, the record before us shows an interaction between father and son that is loving, caring, and happy.

Because of our resolution of the trial court's findings as discussed above, the trial court's ultimate conclusion to terminate Father's parental rights can only be based on its finding that, "Father has made some effort but has yet to establish himself as independent or to obtain his own residence" and that "Father has extensive criminal convictions for drugs and cannot obtain approval from the State of Illinois to allow child to be placed with him." Appellant's App. at 13.

The trial court's finding that Father has neither established himself as independent nor obtained his own residence provides little guidance concerning whether these facts demonstrate that Child's well-being would be threatened by Father's custody. We find Tipton v. Marion County Dep't of Public Welfare, 629 N.E.2d 1262, 1267-68 (Ind. Ct. App. 1994) instructive on this point. In that case, in terminating a father's parental rights, the trial court found among other things that the father failed to demonstrate that he maintained stable housing. The record showed that since the child's birth—a period of a little over four years—father had lived at three different

residences, all belonging to family members. Id. at 1267. Three persons including father lived at his grandmother's house which had four bedrooms. Four people including father lived at his aunt's home which had three bedrooms. Father paid rent when he lived at those places. And at the time of the termination hearing, father was living with his brother in a four-bedroom house with five other people, including the child's cousins. Id. Reversing the judgment of the trial court the Court of Appeals determined that the notion that father's living arrangement justified terminating his parental rights, "reflect[ed] a class or cultural judgment . . . [Instead], "[p]arental unfitness must be established on the basis of individualized proof." Id. at 1268 (citing Stanley v. Illinois, 405 U.S. 645 (1972)). Noting that the trial court "did not conclude that [father] could not provide his child with an adequate home because he moved too frequently or that these places were not suitable for a child," the court concluded, "[t]he evidence offered on the matter of housing does not support a reasonable inference that [father's] living arrangements pose or have ever posed a threat to the well-being of his child." Id. at 1267-68. In fact, the court observed that father's living arrangement with his extended family provided the child a "safety net." Id. at 1268.

In this case, the record shows that Father has lived with his parents for most of his life. Although at the time of Child's birth Father lived with Mother in Indiana, shortly thereafter he again began living with his mother and father in their East Hazel Crest, Illinois home. He resided with his parents until after the home study was conducted pursuant to the Interstate Compact. At that point, case manager Kelly informed Father that, as a result of the home study, he could no longer reside in his parent's home if Child was going to be placed there. Tr. at 64.[7] Father left and moved in with a friend for about two months. Tr. at 63. Thereafter he moved to Chicago, Illinois to live with an aunt, where he pays rent and was living at the time of the termination hearing. Tr. at 63, 70, 71. As in Tipton, here the trial court's findings reveal no causal connection between Father's living arrangements and any adverse impact those arrangements may have on Child. And although we know nothing about the living conditions in the home of Father's aunt, we do know that the home of Father's parents was "clean, spacious and adequately

---

[7] The record is not altogether clear. However, it appears that at some point the case plan anticipated that Father's parents would obtain guardianship of Child. See Tr. 21, 25, 84-86. At the time of the termination hearing Child was residing with Father's parents in Illinois.

11

furnished. . . . [and] [t]here were no hazards observed that would prevent the placement of [Child] into the home." Appellant's App. at 27.

The OFC insists that Father's lifestyle was that of a "transient." Br. of Appellee at 8. See, e.g., J.M. v. Marion County Office of Family & Children, 802 N.E.2d 40, 45 (Ind. Ct. App. 2004), trans. denied (court may properly consider lack of adequate housing when evaluating parental fitness). However the trial court made no such finding, nor did the trial court conclude that Father was unable or unwilling to provide Child with an adequate home or that the homes of Father's relatives were unsuitable for a child. Rather, the trial court's criticism was that Father did not have "his own residence." We agree with the conclusion reached by the Tipton court and conclude here that the evidence offered on the matter of Father's housing does not support a reasonable inference that Father's living arrangements and his alleged lack of independence pose or have ever posed a threat to the well-being of his child.

Finally, in support of its decision to terminate Father's parental rights, the trial court found that, "Father has extensive criminal convictions for drugs and cannot obtain approval from the State of Illinois to allow child to be placed with him." Appellant's App. at 13. This finding suggests one of two possibilities, either: (1) the first clause is intended to stand alone as justification for termination of Father's parental rights, or (2) the first clause is relevant only because of its impact on the second. That is, because of Father's criminal history, Child cannot be placed with Father in Illinois. In any event, neither possibility justifies termination of Father's parental rights.

The record shows that Father, who was twenty-seven years old at the time of the termination hearing, has a criminal history dating from 1994. It includes five arrests and two convictions for possession of marijuana, and one arrest for possession of controlled substances. Appellant's App. at 32.[8]

---

[8] The record shows that although Father's criminal history, which includes drug related activity, is "extensive," his actual criminal convictions for drugs are not. Thus, the evidence of record does not support the trial court's finding on this point. However, this discrepancy does not affect our analysis.

Because Child was born testing positive for cocaine in his system, Father's drug related criminal history cannot be taken lightly. In fact the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. J.K.C. v. Fountain County Dep't of Pub. Welfare, 470 N.E.2d 88, 92 (Ind. Ct. App. 1984). At the same time, however, a trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions. Id.; Odom v. Allen County Dep't of Pub. Welfare, 582 N.E.2d 393, 395 (Ind. Ct. App. 1991).

In this case when first confronted about his numerous arrests, Father explained they occurred during the years that he was an active member of a street gang, and the "crowd he associated with rubbed off on him." Appellant's App. at 29. Nothing in the record shows that Father is currently a street gang member. Rather, according to Father, he has had no gang involvement since 1997. Appellant's App. at 29. And by the time of the termination hearing Father had been employed full-time since August 2003 as a steel cutter in a manufacturing plant. Tr. at 67, 70, 82. Father testified that he has not used any illegal drugs "ever [sic] since my son been born and they took my son." Tr. at 70. Importantly, (a) the trial court made no finding that Father is, or for the past three years has been, involved with illegal drugs, and (b) the record shows that the random drugs tests conducted on Father as a part of the case plan were all negative.

The evidence of record admittedly shows a young man with a troubled past. However by the time of the termination proceedings, and apparently for at least three years before that date, Father has conducted himself in a manner consistent with assuring that his son would be exposed to a healthy drug free environment. We conclude therefore that in this case the existence of Father's past criminal history does not demonstrate that the continuation of the parent-child relationship between Father and Child poses a threat to Child's well being. Stated somewhat differently, the OFC has not demonstrated by clear and convincing evidence that because of Father's past criminal history, "the child's emotional and physical development are threatened" by Father's custody. Egly, 592 N.E.2d at 1234.

13

As for the import of the approval from the State of Illinois to allow placement of Child with Father, we make the following observations. An interstate compact is "an agreement between two or more states, entered into for the purpose of dealing with a problem that transcends state lines." P. Hardy, *Interstate Compacts: The Ties that Bind* 2 (1982). The Interstate Compact on the Placement of Children was drafted in the late 1950s to address concerns about the interstate adoption and foster care placement of children. Kimberly M. Butler, *Child Welfare-Outside the Interstate Compact on the Placement of Children-Placement of a Child with a Natural Parent*, 37 Vill. L. Rev. 896, 906 (1992). Indiana adopted the ICPC in 1978. See Ind. Code §12-17-8-1. All fifty states are now participating members. The ICPC expressly defines its purpose and policy as facilitating cooperation between states in the placement and monitoring of dependent children. Ind. Code § 12-17-8-1, Art. I.[9] By its terms the ICPC addresses "placement." It says nothing one way or the other about whether a parent's parental rights should be terminated. Further, the ICPC does not apply to the sending or bringing of a child into a receiving state when it is done by a parent, stepparent, grandparent, adult brother, sister, uncle or aunt who is leaving the child with a relative or non-agency guardian in the receiving state. Ind. Code § 12-17-8-1, Art. VIII.

Here, not surprisingly, the home study conducted by the Illinois authorities did not evaluate Father's fitness to parent his child. Rather, it only determined that Child could not be placed with Father in Illinois at that time. Thus, the trial court's finding that Father cannot obtain approval from the State of Illinois to allow his son to be placed with him there is not relevant to the question of whether continuation of the parent-child relationship poses a threat to Child's well-being.

---

[9] More specifically, the ICPC declares its intent is to ensure that:

(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with a person or an institution having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(b) The appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(c) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before the placement is made.

(d) Appropriate jurisdictional arrangements for the care of children must be promoted.

## Conclusion

Several of the trial court's findings were either misleading or unsupported by the evidence. And those findings supported by the evidence did not support the trial court's judgment. As a result, the trial court's conclusion that there is reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well being has not been demonstrated by clear and convincing evidence and thus is clearly erroneous. We therefore reverse the judgment of the trial court.

Shepard, C.J., and Dickson and Boehm, JJ., concur.
Sullivan, J., not participating.