Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEY FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**
Feb 16 2012, 9:11 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION )
OF THE PARENT-CHILD RELATIONSHIP OF )
J.D. (MINOR CHILD) and )
 )
R.G. (MOTHER), )
 )
    Appellant-Respondent, )
 )
        vs. )    No. 79A02-1108-JT-850
 )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
 )
    Appellee-Petitioner. )

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas K. Milligan, Senior Judge
Cause No. 79D03-1105-JT-45

**February 16, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

R.G. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her child, J.D. Mother contends that the trial court erred in determining that there is a reasonable probability that the conditions that resulted in J.D.'s placement outside the home will not be remedied and that continuation of the parent-child relationship poses a threat to J.D.'s well-being. Finding no error, we affirm.

**Facts and Procedural History**

In May 2011, the Tippecanoe County Office of the Indiana Department of Child Services ("DCS") filed a petition for the involuntary termination of Mother's parental rights to J.D. In August 2011, following a hearing on the petition, the trial court issued an order that reads in pertinent part as follows:[1]

> 1. J.D. was born to Mother and Father June 8, 2006. When he was eleven days old, the Tippecanoe County Office of the Indiana Department of Child Services became involved and a CHINS [child in need of services] case was opened on the family. The case, 79D03-0606-JC-162, remained open for approximately 10 months and was successfully closed. Since then J.D. has been primarily in the care of his mother although he has, apparently, spent considerable time in the care of his maternal grandmother.
>
> 2. Under the name of R.B., Mother was the subject of Petitions to Terminate Parental Rights to her four children in Cause Numbers 79D03-0411-JT-112 through 119. The parental rights were terminated and the children placed for adoption.
>
> 3. The Department of Child Services received a call in this case in April 201[0]. The call concerned the parents arguing, some domestic violence and father's intoxication. After investigation, the Department recommended services and treated this as an in home CHINS. The services included Head

---

[1] Throughout this opinion, we have replaced names with initials or familial relationships when quoting from the record to protect the parties' anonymity.

Start and Head Start case management for J.D. For Mother the recommendations included counseling and case management through Wabash Valley and domestic violence classes through Child and Family Partners. Apparently no recommendations were made for Father.[2]

4. Mother draws SSI payments and has since she was seven years old. The Area IV Agency on Aging and Community Action Programs has been her representative payee for some time. A goal of hers is to gain some independence and be her own payee, but the Area IV staff does not believe she is capable of adequately managing her money at this time. She lives alone in an apartment but all her fixed expenses are paid by the Agency out of her money and she is given a cash allowance from time to time. She has also required assistance in shopping because of anxiety and d[y]sthymia which make it very difficult for her to shop and take care of business. Money management services have been provided by the staff of the agency to assist Mother to become more independent. Those services started in February 2010. On her own, Mother would struggle. She cannot internalize, remember and act on what she is taught or shown in the various counseling and treatment sessions. Mother has special needs of her own which interfere with her being able to fully care for herself. Her needs are based in her low IQ and low functioning ability and being slow to understand things. While no IQ of Mother was offered in evidence[3] the Court finds as a result of observing her and listening to her testify that Mother is limited in her ability to understand and process information and even more limited in insight and judgment.

5. The CHINS Order and Dispositional Order were entered following a fact finding hearing on May 13, 2010. A Parental Participation Order was entered the same day. Since then services have been provided. J.D.'s needs at that time included: Developmental delays in several areas of his physical and mental life, Seizures, Macrocephaly and balance issues. Also he was not verbal. He communicated by pointing, grunting or screaming. He was considered mildly autistic. There was also the suggestion that he may have cerebral palsy. Only minimal progress for J.D. was noted between April and October of 2010. In October Mother was scheduled to have surgery and had made no arrangements for child care for J.D. during the time of her surgery and recuperation. At that time, the Department of Child Services removed J.D. from Mother's care and he has been out of her home since then, a period of

---

[2] Father later voluntarily terminated his parental rights and is not involved in this appeal.

[3] Mother's counsel acknowledges that a psychological evaluation admitted at the termination hearing indicates that her full-scale IQ is 62. Appellant's Br. at 7 (citing DCS Ex. 17 at 7-8).

approximately 10 months. During that time he has been in foster care and has made great improvements in all of the areas of his deficiencies.

6. J.D. is currently able to speak. While his vocabulary is limited, he is able to make his wishes known by speaking rather than pointing, grunting or screaming. He also now knows his colors, is able to count and has been able to control his emotions. He is quite bonded with his foster mother and the family, particularly a foster sibling who also has disabilities. He is receiving the medical and counseling care that he needs and as a result will be able to enter kindergarten this fall mainstreamed. He has the structure, stability and care that a child with his needs so desperately requires.

7. During the time of the DCS involvement with J.D. and his mother, Mother has been offered a myriad of services through the Area IV Council on Aging, Wabash Valley, Child and Family Partners and Bauer Family Resources. All have offered various counseling and case management services. Her progress has been minimal, largely due to her low functioning, lack of insight and judgment. She consistently has not been able to internalize what she has been taught and cannot remember or recognize when to utilize the skills to which she has been exposed. Also she is easily intimidated, manipulated or persuaded by others, including men who have seemingly taken advantage of her. She also has been deceptive, lying and misleading the DCS team members. She has violated her protective order [against Father] on several occasions. She has violated the safety plan for J.D. as well.

8. While Mother cannot care for J.D. by herself, she has no informal network of support or assistance. There is no family member who could help her except for her mother who has not appropriately supervised J.D. when he was in her care. There are no friends, no church or other group to which she could turn for assistance with child care or other help. She does not have the staying power to see things through. She is easily frustrated and gives up when faced with a difficult situation. She cannot project into the future and anticipate what might happen. She tends to blame others for her problems and sees herself as a victim. She is vulnerable and easily overwhelmed. She minimizes her responsibility. She responds to situations minimally and tends to let "fate run its course". She has benefited from services as much as she is going to.

9. She experiences a high level of parenting stress. She does not understand children. She does not understand their growth and development and does not recognize their feelings. She will not be able to keep up with J.D. as he develops and changes.

4

10.  The child has been removed from his parent(s) for at least six (6) months under a dispositional decree of this Court, Cause number 79D03-1004-JC-80. The Court finds that the conditions which resulted in the removal of J.D. from the home of Mother will not be remedied.  The Court further finds that the reasons for the placement of J.D. outside the home of Mother's home [sic] will not be remedied.  The Court finds that because of J.D.'s special needs and Mother's low functioning and impaired insight and judgment a continuation of the parent-child relationship poses a threat to the well-being of J.D.

11.  The Court finds the best interest of J.D. is served by terminating the parental rights of Mother in and to J.D.  The Tippecanoe County Office of the Indiana Department of Child Services has a satisfactory plan for the care and treatment of J.D. and that is adoption by his current foster family.

The Court grants said petition, and it is ordered that the parent-child relationship between [J.D. and Mother] be, and the same hereby is terminated, and all rights, powers, privileges, immunities, duties and obligations (including the right to consent to adoption) pertaining to the relationship are hereby permanently terminated.

Appellant's App. at 8-10.  Mother now appeals.

**Discussion and Decision**

Our supreme court has recognized that "[t]he Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children."  *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).  A parent's interest in the care, custody, and control of her child is perhaps the oldest fundamental liberty interest.  *Id*.  "Indeed, the parent-child relationship is one of the most valued relationships in our culture."  *Id*. (citation and quotation marks omitted).  Parental interests are not absolute, however, and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights.  *Id*.

Consequently, parental rights may be terminated when the parent is unable or unwilling to meet her parental responsibilities. *Id.*

To involuntarily terminate a parent-child relationship, DCS must allege and prove

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

…

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b) (inapplicable provisions omitted). DCS must prove these elements by clear and convincing evidence. Ind. Code § 31-37-14-2. "Clear and convincing evidence need not show that the custody by the parent is wholly inadequate for the child's survival. Instead, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development would be threatened by the parent's custody." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010) (citation omitted).

6

"This Court has long had a highly deferential standard of review in cases concerning the termination of parental rights." *In re I.A.*, 903 N.E.2d 146, 152-53 (Ind. Ct. App. 2009). In reviewing termination proceedings on appeal, we neither reweigh evidence nor assess witness credibility. *In re J.H.*, 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied*. We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Typically, where the trial court enters findings of fact and conclusions thereon, our standard of review is two-tiered: we first determine whether the evidence supports the findings and then determine whether the findings support the conclusions. *Id.* In deference to the trial court's unique position to assess the evidence, we set aside its findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* "A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it." *Id.* A judgment is clearly erroneous only if the legal conclusions drawn by the trial court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

Mother does not challenge the correctness of the trial court's factual findings. Therefore, we need only determine whether the findings support the conclusions. Mother challenges only two of the conclusions: (1) that there is a reasonable probability that the conditions that resulted in J.D.'s removal will not be remedied; and (2) that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to J.D.'s well-being, as per Indiana Code Section 31-35-2-4(b)(2)(B). Because that

7

subparagraph is written in the disjunctive, DCS was required to establish only one of its requirements. *In re I.A.*, 903 at 153. We address the first.

In determining whether there is a reasonable probability that the conditions that led to a child's removal will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re A.B.*, 924 N.E.2d at 670. "However, the trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id*. (citation and quotation marks omitted).

> The trial court can properly consider the services that the State offered to the parent and the parent's response to those services. Moreover, a DCS is not required to rule out all possibilities of change, but only needs to establish that there is a reasonable probability the parent's behavior will not change.

*Id*. (citation omitted).

As previously mentioned, Mother's parental rights were terminated as to four of her other children.[4] J.D. was removed from Mother's care because she "was scheduled to have surgery and had made no arrangements for child care for J.D. during the time of her surgery and recuperation." Appellant's App. at 9.[5] At that time, J.D. was the subject of an in-home CHINS proceeding because of reported domestic violence between Mother and Father and

---

[4] The termination order in that case indicates that DCS became involved "due to medical neglect and life and health endangerment by Mother's failure to get the children to their appointments for medical treatment, ER abuse and unstable housing." DCS Ex. 30 at 4. The children's father was divorced from Mother and was serving a twenty-four-year sentence for multiple counts of class C felony child molesting.

[5] At the hearing, Mother testified, "I found these two people in the apartment complex and they wasn't approved [by DCS]. Of course now I'm glad they didn't watch him because of what I heard and stuff." Tr. at 55.

8

Father's intoxication. Mother obtained a protective order against Father, but she admitted to violating it. She also admitted to repeatedly associating with "bad men," including Father, who is an abusive alcoholic, and her ex-husband, who is a convicted child molester. Tr. at 53.[6]

Mother was largely compliant with the services offered by DCS and maintained adequate housing and income.[7] Nevertheless, the record supports the trial court's assessment that she "has special needs of her own which interfere with her being able to fully care for herself," let alone her special-needs child, who has made significant progress in his structured, stable, and nurturing foster home. Appellant's App. at 9. Mother does not dispute the trial court's finding that her progress was "minimal, largely due to her low functioning, lack of insight and judgment," and that she "has benefited from services as much as she is going to." *Id*. at 9, 10. Likewise, Mother does not challenge the trial court's determination that she "has not been able to internalize what she has been taught," that she

---

[6] Mother claims that she has "discontinued her relationship" with Father, Appellant's Br. at 11, but DCS Family Case Manager Kathleen Carmosin testified that Mother saw him "approximately a week or two" before the termination hearing. Tr. at 103.

[7] Regarding Mother's housing and income, Area IV Agency employee Stephanie Memmer testified,

> I do have some concern about the long-term internalizing of what [Mother] is learning. For an example, we've talked about when she moved from a two bedroom to a one bedroom [apartment] because of her losing half of her income when [J.D.] was removed, because [J.D.] is also on Social Security. We talked about that "Your income is now half so you have to have an apartment that is half of that income so you can maintain the other things that you would like in your life." We talked about that at two visits; we looked at places for her to move to, and then she would look for places that were just the same amount of rent that she was paying at the two bedroom when we had previously talked about, "You can't go to something that is that expensive because you don't have all that income."

Tr. at 32.

"has been deceptive, lying and misleading the DCS team members," that she is "vulnerable and overwhelmed" and "has no informal network of support or assistance," and that she "will not be able to keep up with J.D. as he develops and changes," especially in light of his special medical and developmental needs. *Id*. at 9, 10.[8]

"The trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *In re I.A.*, 903 N.E.2d at 155. Based on the foregoing, we cannot conclude that the trial court clearly erred in determining that there is a reasonable probability that the conditions that led to J.D.'s removal will not be remedied. Therefore, we affirm the trial court's judgment.

Affirmed.

MAY, J., and BROWN, J., concur.

---

[8] Court-appointed special advocate Devon Moore was one of several witnesses who expressed concern about Mother's ability to meet even J.D.'s basic needs, including nutrition and medical care.