## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 21 2018, 10:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office and
Cass County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill. Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:
M.H. and B.H. (Minor Children),

and,

B.H. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 21, 2018

Court of Appeals Case No.
09A04-1709-JT-2106

Appeal from the Cass Circuit Court

The Honorable Leo T. Burns, Judge

Trial Court Cause No.

09C01-1611-JT-10
09C01-1611-JT-11

**Barnes, Judge.**

# Case Summary

B.H. ("Father") appeals the termination of his parental rights to his children, M.H. and Br.H. We affirm.

# Issue

Father raises one issue, which we restate as whether the evidence is sufficient to support the termination of his parental rights.

# Facts

Twins M.H. and Br.H. ("Children") were born in April 2013 to Father and C.H. ("Mother"). In January 2016, the Children were residing with Mother and her boyfriend. Father saw the Children "only sparingly." Tr. Vol. II p. 124. On January 5, 2016, Mother met with representatives of the Cass County Office of the Department of Child Services ("DCS"), and she appeared to be under the influence of alcohol and admitted to having a few beers before the meeting. On January 7, 2016, DCS removed the Children from Mother's care after Mother and the Children tested positive for marijuana. DCS filed petitions alleging that the Children were Children in Need of Services ("CHINS"). Father and Mother admitted that the Children were CHINS.

The dispositional orders required Father, among other things, to obtain safe and stable housing, obtain a legal and stable source of income, refrain from using illegal controlled substances, complete a parenting assessment and follow all

recommendations, complete a substance abuse assessment and follow all recommendations, submit to random drug screens, and complete a psychological evaluation and follow all recommendations.

In November 2016, DCS filed petitions to terminate Father and Mother's parental rights to the Children. On June 26, 2017, Mother voluntarily relinquished her parental rights to the Children, and she is not involved in this appeal. After a hearing, the trial court entered findings of fact and conclusions thereon terminating Father's parental rights to the Children. Father now appeals.

## Analysis

Father challenges the termination of his parental rights to the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when

the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[7] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Father's parental rights, as required by Indiana Code Section 31-35-2-8. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[8] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)    that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

### A. Trial Court's Findings

[9]    Father argues that several of the trial court's findings are clearly erroneous. He first challenges Finding No. 3, which states: "At the time of the Initial Hearing, . . . . Father failed to appear." Appellant's App. Vol. II pp. 222, 228. According to Father, the finding is clearly erroneous because there is no evidence that Father had notice of the hearing. Although the finding does not explain the reasons for Father's failure to appear, the trial court's finding is technically correct because Father did not appear at that hearing. Moreover, as

DCS points out, Father's failure to appear at this hearing was not a factor in the trial court's conclusion regarding Father's parental rights. The finding is not clearly erroneous, and even if it is erroneous, any error is harmless.

[10] Next, Father challenges Finding No. 14, which provides: "By November 2016, Father's attendance at supervised visits since May 2016 was interrupted after the original service provider noted several incidents of aggressive behavior or threatening comments during visits and home based case management sessions." *Id.* Father argues that there were only two or possibly three incidents of concerning statements. However, on appeal, DCS pointed out at least four incidents of Father's aggressive behavior or threatening comments that are supported by the record. The finding is not clearly erroneous.

[11] Father also challenges Findings Nos. 20, 22, and 23. Finding No. 20 states: "Father blamed his inability to maintain employment on his diagnosis which he claimed to include dwarfism, bipolar disorder and an explosive disorder. Father went on to state that he does not maintain treatment for these condition[s] as he believes he does not need medication to control his various disorder[s]." *Id.* at 223, 229. Finding No. 22 provides: "Instead of taking responsibility for maintaining his own mental health, Father consistently blames other people and refuses to follow the treatment recommendations of those who are in a position to identify Father's mental health needs." *Id.* Finding No. 23 states: "Father's testimony indicates that he wants to be a parent to these children. However, while Father can identify this wish, he continues to blame others for this current situation in life." *Id.* According to

Father, he has acknowledged his difficulties and does not blame others. However, DCS presented evidence that Father blamed his lack of sufficient employment on his mental health diagnosis and lack of education. Father refused to take medication for his mental health diagnosis and refused to participate in therapy. When Father was denied certain housing that he wanted, he responded by threatening people. Given the evidence presented by DCS, we cannot say that the trial court's finding is clearly erroneous.

[12] Next, Father challenges Finding No. 21, which provides: "Father appears to possess the ability to identify the issues in his life. However, Father fails to take meaningful steps to rectify the identified issues." *Id.* According to Father, he participated in therapy, applied for housing benefits, and found employment. He argues that he has taken "some meaningful steps to change his circumstances." Appellant's Br. p. 16. Although Father was able to identify the issues in his life that are holding him back, he failed to follow through with solutions to those issues. Father refused to take medication or participate further in therapy, refused a housing option found by his service providers, and failed to follow through with obtaining a GED. The trial court's finding is not clearly erroneous.

[13] Next, Father challenges Finding No. 24, which states: "Father has no immediate, concrete plans to obtain any stability in his mental health. Further, Father is currently homeless with no inclination to obtain stable housing that would be capable of sustaining himself and these twin four year old boys." Appellant's App. Vol. II pp. 223, 229. Father argues that he has expressed an

inclination to obtain housing but struggles to obtain employment that would sustain housing to accommodate the Children. Father testified that he was "stuck" with his current employment and could not obtain suitable housing without a better job. Tr. Vol. II p. 171. Father appeared to have no inclination to change his circumstances, and the trial court's finding is not clearly erroneous.

[14] Next, Father challenges Finding No. 30, which provides: "Mr. Long [the home-based case manager] attempted to aid Father in building skills relating to parenting but Father was not interested as he believed the proposed approaches were outdated." Appellant's App. Vol. II pp. 224, 230. Father contends that the finding is erroneous because he completed training in the 1, 2, 3 Magic disciplinary program. However, Long testified that he suggested the disciplinary system, but Father was not interested. Father thought it was an "old-fashioned idea" and wanted something "more up to date." Tr. Vol. II p. 75. The finding is not clearly erroneous.

[15] Next, Father challenges Finding No. 38, which states: "Father's behavior is not conducive to parenting young children and when the behavior is displayed in the presence of young children, can be detrimental to their mental and emotional well-being." Appellant's App. Vol. II p. 224, 230. Father argues that his aggressive behavior would not damage the Children's mental or emotional well-being. Father repeatedly displayed aggressive, angry behavior in front of the Children during supervised visitations. The guardian ad litem testified that Father's mental health "impaired his ability to provide necessary

parenting" and ability to take care of the Children.  Tr. Vol. II p. 184.  The record supports the trial court's finding, and it is not clearly erroneous.

[16] Father also challenges Finding No. 43, which provides: "Mr. Myers [the therapist] reviewed previous treatment records and was able to verify some of Father's own statements concerning Father's long history of cycling since childhood.  Some of the cycling behaviors included aggressive behavior, suicidal and homicidal ideations."  Appellant's App. Vol. II pp. 224-25, 231.  Father contends that Myers did not review historical records that showed a history of suicidal or homicidal ideations.  However, Myers testified that he reviewed Father's prior records, which demonstrated an "ongoing . . . cycle of aggressive behavior, of reports of homicidal and suicidal thoughts, . . . distortion of thoughts that this has been something that has been going since childhood and then it also spoke of trauma."  Tr. Vol. II p. 112.  The trial court's finding is not clearly erroneous.

[17] Finally, Father also challenges Finding No. 45, which provides: "Unfortunately, Father only attended two therapy sessions with Mr. Myers and failed to maintain any type of mental health treatment following his final session in November 2016."  Appellant's App. Vol. II pp. 225, 231.  Father argues that he attended four or five sessions with Myers.  DCS concedes that Father is correct that he attended four or five sessions.  However, Father was supposed to attend three sessions a week with Myers, but Father simply refused to attend.  The trial court's finding is incorrect as to the number of sessions Father attended but correct regarding Father's failure to maintain mental health

treatment. We conclude that the trial court's minor error is harmless and does not impact its ultimate decision here.

### B. Threat to Children's Well-Being

[18] Father also argues that the trial court's finding of a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children is clearly erroneous. In making such a decision, the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). At the same time, however, a trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions. *Id.*

[19] Father argues that his relationship with the Children is not a threat to their well-being. According to Father, he was "patient, attentive, affectionate, and prepared" when he visited with the Children. Appellant's Br. p. 18.

[20] DCS presented evidence that the specific concerns regarding Father are his overall stability, including stability in housing, stability in mental health, and stability regarding substance abuse. Father has been diagnosed with schizophrenia, bipolar disorder, a learning disability, mood swings, an explosive disorder, anxiety, depression, and ADHD. When DCS started working with Father, he was homeless, and Steven Long, the home-based case manager, worked with Father on obtaining housing and employment and

parenting skills. Although Long discovered that Father was eligible to live at the Emmaus Mission, Father was not interested in living there. When Father learned that he had been denied housing with a different program, Father became angry and told Long, "maybe it was time to shake things up. Maybe time for a little chaos." Tr. Vol. II p. 77. When Long asked what he meant, Father said, "you know, shooting, stabbings, you know, that kind of thing." *Id.* Long told Father that he did not have the right to take someone's life, and Father disagreed. Long asked if Father was going to "start with me," and Father said, "I think I'll just not say anything because then people would take steps to prevent me from doing so." *Id.* at 77-78. The DCS family case manager then had a meeting with Father and Long, and Father "doubled-down" on the threats. *Id.* at 136. Father said, "society needed to die," "there was nothing wrong with murder," and noted that he carried a knife with him in his backpack. *Id.* Long noted that Father's attitude was "pretty negative," Father is "very defensive" and "not very trusting of other people." *Id.* at 79.

[21] Father's aggressive and violent tendencies were also on display during supervised visits with the Children. Connie White supervised visits between Father and the Children. White observed Father kicking toys because he was aggravated to be in a small room. White moved the visits to the park and a McDonald's play area. At the park, Father was walking toward White and the Children carrying a duffel bag. He dropped the bag, kicked a ball, and threw the bag. When White told him that he could not behave in that manner in front of the Children, Father said, "well then f'ing [sic] leave, f'ing [sic] leave." *Id.* at

148. Later that day, as she was leaving the DCS office, White saw Father, and he pointed and said, "your [sic] next." *Id.* at 149.

[22] During Father's substance abuse assessment, he made comments "that sounded homicidal in nature," and he confirmed that "he was having some of those thoughts." *Id.* at 92. The person performing the assessment brought in another therapist to do an emergency survey to assess "suicidal or homicidal ideation." *Id.* at 93. They recommended an in-patient service, and Father declined. The police later did a welfare check to make sure Father was not going to harm himself or others. The therapist also recommended individual therapy. Father appeared for a few of the individual therapy sessions and then stopped attending. Father did not follow through with the recommendation for therapy. The therapist reported that Father has had an ongoing cycle of "aggressive behavior, of reports of homicidal and suicidal thoughts, . . . distortion of thoughts that this has been something that has been going since childhood . . . ." *Id.* at 112.

[23] DCS family case manager James Steele noted that Father completed only eight or nine drugs screens and tested positive in four or five of those screens. He then refused to take any more drug screens. Father has been unwilling to talk about his substance abuse or admit that he has an issue. Rather, he states that "what he does on his time . . . without the children present should not . . . make any difference" to DCS and "if he wants to smoke marijuana without the kids present, that should be his right to do so." *Id.* at 128. Father demonstrated an unwillingness to work "with just about anyone that [DCS] put in contact with

him" due to personality conflicts or just an unwillingness to do the things they wanted him to do. *Id.* at 137. Steele did not believe they had made "almost any progress at all" toward Father's issues. *Id.* at 139. The GAL opined that Father's mental health "impaired his ability to provide necessary parenting . . . ." *Id.* at 184. The GAL did not believe that the situation was likely to change given Father's history.

[24] At the time of the termination hearing, Father lived wherever he could and did not have stable housing. He was employed at a chicken farm and acknowledged that he has trouble finding and maintaining employment. Father also acknowledged that he refused to take medications for his conditions and had refused therapy. He believed that his lack of stable housing was preventing him from caring for the Children and that his lack of stable housing was caused by his low-paying job. However, he believed that he was "pretty much stuck" with his current employment because he did not have "a GED or high school diploma." *Id.* at 171. Father also stated that his mental health diagnosis was "affecting [him] finding a job and keeping it." *Id.* at 168. Father believed that smoking marijuana made him "calm" and helped him "cope in life." *Id.* at 176-77.

[25] Although Father has received services since February 2016, he has made little progress since then. Given his problems with aggressive behavior and homicidal and suicidal ideations, his failure to address his mental health issues with medication and/or therapy, and his ongoing homelessness and substance abuse, we cannot say the trial court's conclusion that the continuation of

Father's parent-child relationship posed a threat to the Children is clearly erroneous.

## Conclusion

[26] The evidence is sufficient to support the termination of Father's parental rights to the Children. We affirm.

[27] Affirmed.

Najam, J., and Mathias, J., concur.