**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 19 2013, 5:36 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CAROLYN J. NICHOLS**
Noblesville, Indiana

ATTORNEYS FOR APPELLEE:

**MICHAEL C. PRICE**
DCS, Hamilton County Local Office
Noblesville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
X.M., Minor Child, )
)
A.B., Mother, )
)
    Appellant-Respondent, )
)
        vs. )    No. 29A02-1212-JT-961
)
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE HAMILTON CIRCUIT COURT
The Honorable Paul A. Felix, Judge
The Honorable Todd L. Ruetz, Master Commissioner
Cause No. 29C01-1203-JT-398

**August 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

A.B. ("Mother") appeals the involuntary termination of her parental rights to her child, X.M. Mother raises one issue, which we revise and restate as whether the evidence is sufficient to support the trial court's judgment terminating her parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of X.M., born on July 31, 1998.[1] X.M. is non-verbal and has moderate range cognitive disability as well as speech impairment.[2] The evidence most favorable to the trial court's judgment reveals that in July 2011, the local Hamilton County office of the Indiana Department of Child Services ("HCDCS") received a report that X.M. had been beaten with a belt across his upper back and torso in order to discipline him. HCDCS initiated an assessment of the matter, and, on July 25, 2011, filed a petition alleging X.M. was a child in need of services ("CHINS"), stating that Mother had struck X.M. with the belt, causing bruising and lacerations. The petition also stated that Mother admitted to sleeping during the day and leaving X.M. and his

---

[1] The juvenile court also terminated the parental rights of X.M.'s biological father, M.M. ("Father"). Father, however, does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

[2] An Initial Evaluation and Treatment Plan prepared by Children's Bureau and contained in the record indicates that X.M. has been diagnosed with spina bifida. Exhibit A at Children's Bureau's Initial Evaluation and Treatment Plan, at page 2. Jeri Gibson, one of the HCDCS case managers who worked on this matter, testified that X.M. has an IQ of 59 and has a communication disability, and she noted that X.M. "needs 24/7 care for all his basic needs." Transcript at 37-38.

2

sibling, P.B.,[3] without adult supervision. The petition further stated that there were two prior substantiated reports of physical abuse related to Mother.[4]

That same day, the court held a probable cause hearing on HCDCS's request to file the CHINS petition, found that probable cause existed that X.M. was a CHINS, and awarded HCDCS responsibility for placement of X.M. The court also held an initial hearing on the CHINS petition wherein Mother denied the allegations, and the court appointed counsel for Mother and set a date for a fact-finding hearing. The court also issued an emergency custody order allowing for the immediate removal of X.M. from Mother's home, noting that X.M. had been beaten with a belt across his upper back and torso leaving discernible wounds, abuse had previously been substantiated as to Mother for the same conduct against the child, Mother had been arrested for battery against another child, and highlighting that X.M. "suffers from mental impairment . . . and is reportedly non-verbal," and that his "physical or mental condition will be seriously impaired or endangered if not immediately removed from the home . . . ." Appellant's Appendix at 69.

On August 25, 2011, Mother met with Brooke Hartman at LifeSolutions Counseling ("LifeSolutions") and indicated that she had not used drugs in the last six months, but that she used marijuana weekly "to zone out." Exhibit A at August 25, 2011 Mental Health Assessment. Hartman noted that Mother appeared to be cognitively

---

[3] P.B. was also removed from Mother's care in July 2011, and a CHINS action was pursued on her behalf as well.

[4] The record reveals that Mother had previous involvement with the Department of Child Services four years ago due to a previous spanking incident involving X.M. Mother received counseling through Children's Bureau. The record also reveals that the Department of Child Services became involved in investigating an incident in which Mother was previously arrested for hitting her boyfriend's child in the mouth.

delayed and that Mother reported she had a learning disability but that she was unsure what it was specifically. Hartman stated in her report that Mother was fully cooperative, that she maintained eye contact and displayed an appropriate mood, and her thought content was appropriate. She also estimated that Mother's intelligence was below average and that she displayed poor judgment. Hartman determined that Mother was to receive treatment on a weekly basis and that the focus would be to help her obtain a GED, a job, financial resources, transportation, a driver's license, and basic child development skills, and that the goal was reunification and for Mother to better understand discipline.

On August 26, 2011, the court entered an order appointing the GAL/CASA Program as Guardian ad Litem (the "GAL") to represent X.M.'s interests, appointing Maggie Petersen as the GAL/CASA volunteer, and appointing Trenna Parker as the attorney for the GAL/CASA volunteer. On September 12, 2011, the court held a fact-finding hearing and adjudicated X.M. a CHINS. The court also conducted a dispositional hearing and issued a dispositional order in which it granted wardship of X.M. to HCDCS and ordered that he continue in his placement in relative care, and that Mother fulfill certain requirements and participate in various services, including that she: (1) cooperate with HCDCS and the GAL by maintain routine and weekly contact, keep all scheduled appointments, including with all service providers, and respond to telephone calls and letter correspondence; (2) notify HCDCS and the GAL of any change of living situation; (3) allowing HCDCS, service providers, and/or the GAL to make announced or unannounced visits to her home; (4) sign any necessary releases of information for

4

HCDCS and the GAL to monitor compliance and progress in service provision; (5) obtain and/or maintain housing and a source of support, income, or employment; (6) participate in and successfully complete a parenting assessment and follow all recommendations; (7) participate in visitation as established by HCDCS; (8) participate in and successfully complete home-based therapy and follow all recommendations; and (9) participate and successfully complete a psychological evaluation and follow all recommendations.

Mother's participation in court-ordered services was inconsistent throughout the CHINS case and ultimately unsuccessful. Hartman thought that Mother was engaged and motivated to work toward her goals when they first began working together, but she also noticed that Mother had difficulty understanding the reasons for her children's removal. Hartman would repeatedly explain to Mother why X.M. had been removed. Hartman also encouraged Mother to schedule a psychological evaluation as ordered by the court and as HCDCS requested, but Mother resisted undergoing the evaluation because "she was afraid that they would tell her that she was dumb or that they would use the information to not let her have her kids back." Transcript at 147-148. Although Mother initially attended her scheduled appointments at LifeSolutions, she began missing appointments beginning in October of 2011. On October 21, 2011, Mother attended an appointment and appeared frustrated that she could not have X.M. back despite the fact that the reason had been explained to her multiple times. Mother stated her belief that the reason why X.M. and P.B. had been removed was due to their behavior and not Mother's

actions, and Mother indicated that, given the same circumstances, she would discipline her children in the same manner.

Also, in October 2011, HCDCS changed X.M.'s placement and placed him at the home of T.G., the biological father of X.M.'s half sibling, J.G., who also lived in the home. J.G. is the offspring of T.G. and Mother, and T.G. has cared for J.G. for about five years. T.G. was in a relationship with Mother for the first two years of X.M.'s life and was a caregiver to X.M.

On November 1, 2011, Mother walked to Aspire to begin a psychological evaluation, and she completed the initial intake. The tests identified that Mother had an impulse control disorder, unspecified mental retardation, and other psychological and environmental problems. Mother's Exhibit C. Despite completing the intake, Mother did not follow through with follow up meetings in order to complete a full evaluation. On December 13, 2011, Aspire sent Mother an outreach letter, but Mother did not respond to that letter. Aspire terminated the referral, noting "Client withdrew" as the reason for termination. Id. Also, in late November 2011, Mother quit returning Hartman's calls on behalf of LifeSolutions. Hartman attempted to reach Mother by phone on seven different days in late November and left voicemail until Mother's voicemail box became full, Mother did not return the calls, and in mid-December LifeSolutions terminated their services to Mother because they were no longer able to contact her.

The case manager with HCDCS, Korina Galang, made multiple attempts in December 2011 to contact Mother but was unsuccessful. In February 2012, a new family case manager, Jeri Gibson, was assigned to Mother and, after multiple phone calls, on

6

February 8, 2012, she succeeded in reaching Mother. Mother agreed to come to the HCDCS office on February 10, 2012, in order to discuss restarting services with the goal of reunification; however, Mother did not show for the appointment. Gibson left a voicemail message for Mother, but she did not hear back from her. Gibson also went to Mother's home a couple of times and left her business card in Mother's door. Gibson obtained a new phone number for Mother, but in March 2012, she learned that the number had been disconnected. Gibson also contacted a relative of Mother and obtained an additional phone number for Mother, but she was unsuccessful in establishing contact.

Despite Gibson's overtures and the fact that Mother knew that HCDCS's office was located about a mile from her home and was walkable, Mother never contacted Gibson. Further, at one point Mother moved into a different apartment in the same apartment complex but did not inform Gibson, and later, in March or April Gibson found out about the move from T.G. Gibson visited the new apartment and again left her business card, but Mother never contacted her.

On March 12, 2012, the court held a review hearing in which Mother failed to appear, although her counsel did appear. The court issued an order approving the proposed permanency plan filed by HCDCS to terminate the parent-child relationship between X.M. and Mother, and for X.M. to be adopted by T.G. The order noted that Mother:

> is not in compliance with [X.M.'s] case plan as follows: [She] has failed to participate in home-based therapy and case management leading to services being closed out due to lack of commitment and missed appointments. [She] has also failed to complete a mental health evaluation as previously ordered. [She] has not had visitation with the child since December of 2011, and has had multiple cancelled or missed visitation sessions.

7

[Mother] has failed to maintain routine contact with [HCDCS], the GAL, or engaged service providers.

Appellant's Appendix at 45-46. The court also ordered that reunification services be suspended. On March 15, 2012, Mother filed a Motion for Review of Permanency Plan which was denied.[5]

On March 19, 2012, HCDCS filed its petition for involuntary termination of the parent-child relationship pursuant to Ind. Code § 31-35-2-4. On April 30, 2012, the court held an initial hearing on the termination petition in which Mother entered a denial, and the court set the matter for a fact-finding hearing on July 9, 2012, which was continued at Mother's request. On July 23, 2012, the court held the fact-finding hearing at which Mother appeared. At the hearing, Gibson testified that a parenting assessment was not completed "due to lack of responding to the service providers' contact." Transcript at 26. Gibson testified that, in addition to the discontinuation of services by LifeSolutions at the end of 2011 due to lack of participation by Mother, supervised visitation of X.M. was discontinued in November 2011 because Mother repeatedly cancelled or failed to show for scheduled visits. Gibson testified that, to her knowledge, Mother had not visited X.M. since December of 2011 despite the fact that T.G. has "had an open door as far as [Mother] wanting to come and visit her children as well as making phone calls." Id. at 35. She also noted that Mother does periodically phone X.M., although it is on a less-than-weekly basis.

---

[5] Mother stated in her motion that the permanency hearing occurred on March 12, 2012, at 9:30 a.m., that she appeared on March 12, 2012, at 10:30 a.m., and that she believed that the hearing was scheduled for 10:30 a.m. Mother requested to "be heard as to her desire to complete services [] and the reasons for any problems in completing services." Appellant's Appendix at 50.

8

Gibson stated that when she took over the case in February of 2012 and attempted repeatedly to contact Mother, her intent was to try and "keep this going and get [Mother] engaged in services and efforts to reunify." Id. at 31. Gibson testified that, by being persistent in making contact with Mother and by offering to meet with Mother in her home, she was attempting to accommodate Mother's lower cognitive abilities. Gibson also testified that when she spoke with Mother on February 8, 2012, she did not recall any difficulty about the conversation and believed that Mother understood what was being asked of her and that "if [Mother] didn't understand, [she would be] concerned [about Mother's] ability to care for a child with the extent of the disabilities that [X.M.] does have." Id. at 67. Gibson further testified that on February 8, 2012, Mother specifically told her that she preferred to come to the HCDCS office, that Mother knew where the office was, that Mother could walk to the office, and that Mother had said that she would be there at 1:00 p.m. on Friday, February 10, 2012, but did not show.

Gibson told the court that up to that point, Mother had not made contact with her, and she noted that contact was necessary in order for a successful reunification because she would need to speak with Mother about services and progress. Gibson also noted that she and Mother spoke in the courthouse hallway on March 12, 2012 following the review hearing as Mother had arrived after the hearing had ended, and that Gibson had not spoken with Mother since that time.

Gibson also testified that T.G. maintains a clean and appropriate home and that T.G. "is very in tune with what [X.M.'s] needs are pertaining to his disability. He's very nurturing. There's a definite bond." Id. at 38. When asked her opinion regarding what

9

was in X.M.'s best interest, Gibson stated that T.G. wants to adopt X.M., that X.M. wants to be adopted by T.G. and calls him daddy, that X.M. is very attached to J.G., and that it would be in X.M.'s best interest to proceed with the permanency plan. Gibson also indicated that, to her knowledge, Mother was not employed. When asked on cross-examination about how HCDCS approaches a client with "significant cognitive delays," and specifically what HCDCS does differently to accommodate such clients, Gibson replied: "I think that's why we were asking to get a parenting assessment and a psychological evaluation so they could give us recommendations as to how to proceed with services for [Mother]." Id. at 50.

Following Gibson's testimony, the court continued the hearing. On July 27, 2012, Mother filed a Renewed Motion for Review of Permanency Plan and Request for Guardian Ad Litem under the CHINS Cause Number in which she reiterated her reasons for review as made in March 2012, including that she was mistaken as to the time for the review hearing. Additionally, Mother's counsel stated that in preparing for the July 23, 2012 termination hearing, she discovered "a report from Aspire dated November of 2011 which indicates that biological Mother has possibly severe mental limitations" and counsel was previously "unaware of the extent of the issue but was aware of 'cognitive delays.'" Appellant's Appendix at 36. Then, on August 14, 2012, Mother filed an identical motion in the termination proceeding. The next day, the court entered an order in the CHINS proceeding setting the matter for hearing on September 10, 2012, and ordering the appointment of a Guardian ad Litem for Mother. On August 20, 2012, the

court issued an order in the termination proceeding noting that the permanency plan would be reviewed as part of the fact-finding hearing set for October 1, 2012.

On September 10, 2012, the court held a hearing on Mother's motion in the CHINS proceeding, Mother failed to appear despite proper notice, although her counsel did appear. Mother's counsel indicated that "she did send notice of the hearing to [Mother], and is unaware as to where her client is or why" Mother was not present. Id. at 26. The court issued an order maintaining the permanency plan of termination and adoption by T.G. in which it noted that Mother had failed to participate in reunification services, failed to participate in a mental health assessment, had missed multiple appointments, and that, following the termination hearing on July 23, 2012, HCDCS "attempted to engage [her] to participate in another psychological assessment referral" and "[d]espite multiple attempts to reach [her] . . . [she] made no response or other effort to participate" and "failed to attend [the] hearing as well."[6] Id. at 27.

On October 1, 2012, the court resumed the fact-finding hearing in the termination proceeding, and again Mother failed to appear. When asked if there was a reason for Mother's absence, Mother's counsel stated that she did not know of a reason, that she corresponded with Mother and received correspondence back from Mother, and that Mother "has or should have had knowledge of today's date with the correspondence." Transcript at 79. Mother's counsel speculated that Mother was "just withdrawing from the particular issues at hand . . . ." Id.

---

[6] The order noted to be "effective the 10th day of September 2012," but it was filed on November 9, 2012. Appellant's Appendix at 30.

11

The court proceeded with the hearing, and HCDCS called T.G. as a witness. T.G. testified that he first met X.M. when X.M. was two years old, that he lived with Mother for three or four years when X.M. was between two and five or six years old, that he and Mother have a daughter together, J.G., who is eight years old, and that J.G. had been in T.G.'s care for the past five years. T.G. testified that after he and Mother ended their relationship, Mother married a person who would abuse X.M. and J.G., specifically beating them, burning J.G. with cigarettes and fondling her, and due to such incidences T.G. established paternity and obtained custody of J.G. T.G. testified that he decided to have X.M. live with him because X.M. is J.G.'s sibling and deserved to grow up with his sister and that T.G. has known X.M. for most of X.M.'s life. T.G. stated that currently X.M. "now has some pride" in himself, that he loves going to school and is a straight A student, and that T.G. is making X.M. work on his speech, noting that before he would not try to speak and would instead make animal noises. Id. at 90. T.G. also noted that X.M. enjoys wrestling and was enrolled in a boxing self-defense class which he enjoys. T.G. testified that he was employed by the Amazon Distribution Center and was able to provide for all of X.M.'s necessities. T.G. was asked about the progress X.M. has made and whether it would continue if he were returned to Mother, and T.G. stated that the progress "would decline just like that" because Mother would "not do anything to try to keep the progress going." Id. at 103.

When asked about Mother's ability to communicate effectively and comprehend what others tell her, T.G. testified that she "understands completely what's going on and . . . all this right here is a game to her." Id. at 92-93. T.G. testified that he spoke with

12

Mother on August 15th and told her "this little game that you're trying to play that you're retarded, it's not going to fly," and Mother responded: "Well, we'll see about that." Id. at 93. He said that Mother will usually call the children soon before an upcoming court date, and he estimated that her frequency of calling was less than once per month. T.G. also testified that X.M. does not want to be returned to Mother and is fearful of being sent home with her. T.G. specifically spoke about the second-to-last time X.M. and Mother saw each other, which was at Christmas in 2011. He said that X.M. did not talk to Mother and would walk past her, and near the end of the gathering they spoke and X.M. grabbed T.G.'s arm, holding it tight while speaking to Mother. Mother also saw X.M. in March or April of 2012 when T.G. took Mother some food because she did not have any food.

HCDCS then called Hartman who testified to facts consistent with the foregoing. Andrew Dickerson, who took over as case manager from Gibson, was then called, and he testified that when he received the case he attempted to have Mother undergo a psychological assessment through LifeSolutions. LifeSolutions made between six and eight attempts to arrange for the assessment which were unsuccessful. Dickerson testified that there were no concerns about T.G.'s household, that he was impressed with T.G., and that it would be in X.M.'s best interests to stay with T.G.

HCDCS next called Trenna Parker, who by that time was both the attorney and the volunteer representing the GAL, and she testified that, at that juncture, it was in the best interest of X.M. to remain with T.G. and noted that X.M. was very strongly attached to J.G. Parker testified that she also had made attempts to contact Mother but had been

13

unsuccessful in doing so. She stated that although "mental health issues are not necessarily the fault of the person who has them, if they are untreated . . . it is difficult for them to care for their children" and that although not blaming Mother, "inability to provide for your children one way or the other is an inability to provide for them and in [her] opinion it's in [X.M.'s] best interest for him to remain with [T.G.]." Id. at 169.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On November 9, 2012, the court entered its findings of fact, conclusions of law, and judgment terminating the parent-child relationship between Mother and X.M. Mother now appeals.

## STANDARD OF REVIEW

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied; see also Bester, 839 N.E.2d at 147.

14

Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[7]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied.  "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship."  Ind. Code § 31-35-2-8(a) (emphasis added).  Here, Mother appears to challenge the sufficiency of the evidence supporting the trial court's findings as to subparagraph (b)(2)(B) and (b)(2)(C) of the termination statute cited above.

DISCUSSION

A.  ARGUMENTS OF PARTIES.

First, we observe that Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the State to establish, by clear and convincing evidence, only one of the three requirements of subparagraph 4(b)(2)(B).  Here, Mother "requests appellate review" of the facts alleged under both parts (i) and (ii), arguing that HCDCS "failed in its burden of proving either" because "the findings of fact are based upon an erroneous assumption that she was provided appropriate family preservation and reunification services" and that, accordingly, "it is impossible to find with any degree of accuracy that there is a reasonable probability" that either the conditions that resulted in X.M.'s removal will not be remedied or that the continuation of the parent-child relationship poses a threat to X.M.'s well-being.  Appellant's Brief at 18.  Mother also asserts, pursuant to subparagraph 4(b)(2)(C),  that "Indiana law presumes the best interests of its children are

---

[7]  We observe that Ind. Code § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

served by remaining in the care and custody of their natural parents," that she was "only trying to protect her son" by administering the discipline that led to X.M.'s removal, and again argues that "without an adequate opportunity to be engaged in modified and appropriate parenting education services, she has not had a full and fair opportunity to demonstrate her ability to learn, to change, and to properly parent her children." Id. at 23-24. Thus, Mother raises essentially the same issue in challenging the trial court's findings under both subparagraphs 4(b)(2)(B) and 4(b)(2)(C).

Specifically, Mother asserts that "the format of the parenting education services . . . frustrated Mother to the point that she would break down and cry," noting that the counselors "simply reiterated the same information in the same verbal format week after week . . . ." Id. at 18-19. Mother notes that the Termination Summary prepared by Aspire "listed 'Unspecified Mental Retardation' as [her] Axis II diagnoses," and she contends that although "she did fail to follow the court order and the service providers' recommendations to obtain a full scale psychological evaluation," it "is hard to understand why, when a home based case manager was seeing Mother every week, the case manager did not transport Mother to the local Aspire office to be certain that this goal was accomplished early in the case." Id. at 19. Mother points to her frequency in missing court hearings and other meetings "due to her mental confusion" and argues that "[s]he needed more help and direction in order to attend appointments in a timely manner." Id. at 20.

Mother goes on to discuss "effective techniques for providing parenting education to developmentally disabled parents," including using education employing "both verbal

and non-verbal (modeling) training," over a period of several months and "using charts with stickers so that parents track their behavior changes" as well as using "tangible positive reinforcements such as gift certificates, toys, or clothing provided to parents who maintained improved parenting techniques over time." Id. Mother also argues that "modifications of parent training techniques" such as these "would be expected of any State program providing services to disabled parents in compliance with requirements of the Americans with Disabilities Act of 1990, 42 USCS §§ 12101, et seq." Id. at 21. Mother also acknowledges in her brief that HCDCS was "not required to prove the adequate provision of reunification services in a proceeding to terminate parental rights" but notes that HCDCS was required to provide reasonable efforts at reunification as part of the underlying CHINS case. Id. at 22 (citing Ind. Code § 31-34-21-5.5(b)).

HCDCS begins by asserting that "Mother's entire argument on appeal is that DCS did not provide Mother with adequate services to address her mental capacity issues and parenting deficits" and that, as a result, the court was unable to make an accurate determination based upon parts (i) and (ii) of Ind. Code § 31-35-2-4(b)(2)(B) or 4(b)(2)(C). Appellee's Brief at 17. HCDCS argues that Mother's "arguments are not supported by citations to authorities and relevant parts of the record on appeal to show that [HCDCS] has an obligation to do so" and that accordingly Mother has waived these issues. Id. HCDCS also contends that Mother is raising an issue more appropriate for a CHINS case rather than a termination of parental rights case, noting that Indiana courts have consistently held that failing to provide services does not serve as a basis on which to directly attack a termination order as contrary to law. Id. at 18 (citing In re H.L., 915

18

N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009)). HCDCS notes that this court has stated that "even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal," In re E.E., 736 N.E.2d 791, 796 (Ind. Ct. App. 2000), and thus to the extent Mother raises such issues pursuant to Ind. Code § 31-34-21-5.5, she has waived the issue. Appellee's Brief at 18.

HCDCS proceeds to address Mother's claims regarding its efforts towards reunification, arguing that Indiana case law places the onus on the parent to request additional assistance from the court or DCS, that Mother did not seek out or request additional services, and that "Mother effectively removed herself from continued participation in home-based therapy, refusing to respond to multiple attempts to engage her." Id. at 20 (citing Prince v. Allen Cnty. DCS, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) ("The responsibility to make positive changes will stay where it must, on the parent. If the parent feels the services ordered by the court are inadequate to facilitate the changes needed for reunification, then the onus is on the parent to request additional assistance from the court or DCS."). HCDCS argues that Mother's decision not to participate in services, including undergoing a psychological evaluation, "killed any opportunity for [HCDCS] or engaged service providers to get a full and thorough assessment, and therefore any opportunity to identify specific treatment or therapy mechanisms or formats that may have made a greater difference." Id.

HCDCS maintains that although it is clear that "Mother had some form of cognitive delay," HCDCS "needed more information about how to deal with [her] condition," and Mother "simply did not comply with completing the full evaluation . . . ."

Id. at 21. HCDCS also notes that it "did not give up on Mother" and points to its repeated attempts to "re-engage Mother in services . . . even after [it] had initiated termination proceedings and the juvenile court had ordered that [HCDCS] did not have to provide [her] with services." Id. at 21-22. HCDCS also responds to Mother's suggestion that it did not comply with the Americans with Disabilities Act by noting that the case Mother cites in support actually "held that parents' discrimination claim under the ADA cannot serve as a basis to attack the termination order itself." Id. at 21 (citing Stone v. Daviess Cnty. Div. of Children and Family Servs., 656 N.E.2d 824, 830 (Ind. Ct. App. 1995), trans. denied). Finally, to the extent that HCDCS discusses the elements of Ind. Code § 31-35-2-4(b)(2), it notes that "Mother does not specifically challenge any of the juvenile court's findings of fact" and accordingly "this Court only need review the juvenile court's unchallenged findings to determine whether they support the court's termination judgment." Id. at 27.

B. ANALYSIS AND DECISION

In E.E., this court affirmed the termination of the biological mother's parental rights to her daughter, and on appeal the mother challenged the termination on the grounds that the governing agency, the Marion County Office of Families and Children, failed to accommodate Mother's disability when providing services in compliance with the Americans with Disabilities Act (the "ADA"). 736 N.E.2d at 793, 795. The court acknowledged that "[w]hen an agency opts to provide services to assist parents in improving parental skills, the provision of those services must be in compliance with the ADA," but it also noted that "the provision of family services is not a requisite element of

20

our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal." Id. at 796; see also id. (citing Jackson v. Madison Cnty. Dep't of Family & Children, 690 N.E.2d 792, 793 (Ind. Ct. App. 1998) (holding that in a termination of parental rights proceeding, a welfare department is not required to plead and prove that it offered services), trans. denied). The court held that providing "family services is not a requisite element of our parental rights termination statute" and "[a] failure to provide services, or the provision of services in an allegedly discriminatory manner, does not serve as a basis on which to directly attack a termination order as contrary to law." Id.; see also In re B.D.J., 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) (noting that at a termination hearing, a "trial court can reasonably consider the services offered . . . and the parent's response to those services" but that "the law concerning termination of parental rights does not require" that services be offered to correct deficiencies in childcare and that "termination of parental rights may occur . . . as long as the elements of Ind. Code § 31-35-2-4 are proven by clear and convincing evidence"); Stone, 656 N.E.2d at 830 ("Our supreme court has held that the Indiana termination of parental rights statute does not require the agency to prove that any services have been offered to the parent to assist in fulfilling parental obligations.").

In addition, the record before us reveals that HCDCS's efforts to reunify Mother and X.M. were reasonable, and indeed, to the extent that Mother may have received inadequate reunification services, it was not for lack of effort on the part of HCDCS. The record reveals that Mother met with Hartman at LifeSolutions on August 25, 2011, which

21

was a month following the filing of the CHINS petition. Hartman set up a weekly treatment schedule to help Mother obtain a GED, a job, financial resources, transportation, a driver's license, and basic child development skills, and the goal of the treatment was reunification of Mother with X.M. and to help Mother better understand discipline. Hartman also referred Mother to Aspire in order to obtain a psychological evaluation. Initially, Mother attended her appointments with Hartman at LifeSolutions, but by October of 2011 she began missing appointments. Mother did complete an initial intake with Aspire, but she did not follow through with attending any follow up meetings in order to complete a full evaluation. Also, despite repeated attempts by Hartman to reach Mother, including phoning her on seven different days, Mother did not return any of her calls. Near the end of 2011, due to Mother's failure to communicate with LifeSolutions and Aspire, both organizations terminated their services with Mother.

Galang, the initial HCDCS case manager assigned to Mother, repeatedly attempted to reach her in December 2011 but was similarly unsuccessful. Gibson was assigned to Mother in February 2012, and although she was eventually able to contact Mother on February 8, 2012 and schedule a meeting to discuss restarting reunification services, Mother did not show up for the appointment. Gibson visited Mother's home on multiple occasions and left her business card. Gibson also tried a different phone number in order to reach Mother, but was again unsuccessful. Also around that time, Mother moved to a different unit in the same apartment building and did not inform Gibson despite an order from the court that she do so. Gibson found out about Mother's new unit from T.G., and she attempted to visit Mother at that location but was unsuccessful. Dickerson, the third

HCDCS case manager to handle Mother's case, also attempted to engage Mother and have her undergo a psychological assessment, making between six and eight attempts to do so, but he was unsuccessful. Mother may not fail to accept and participate in services offered, including failing to participate in a psychological evaluation which would have assisted the service providers in tailoring services to fit Mother's needs, and then successfully argue that she was denied adequate services. See B.D.J., 728 N.E.2d at 201 ("[A] parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting."); see also H.L., 915 N.E.2d at 148 (observing that the parent did not show that DCS "failed to make reasonable efforts toward family preservation"). Indeed, we note that in the court's initial dispositional order issued on September 12, 2011, the court ordered that Mother fulfill certain requirements and participate in various services and listed nine specific requirements, but Mother failed to comply with almost all of them. We also note that Mother's assertions that HCDCS failed to provide adequate services amount to an impermissible invitation to reweigh the evidence.[8] See In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied.

---

[8] We observe that the court's Finding 22 addresses the issue of provision of services as follows:

[Mother] is either incapable of understanding what was required of her to successfully reunify with her child, or unwilling to comply with those requirements. This includes even the most basic requirement of maintaining contact with service providers, attending meetings, or even responding to phone messages. [Her] failure on at least two occasions to complete psychological evaluations has made it impossible to diagnose or treat her conditions. Ultimately, whether it is an inability or an unwillingness to participate makes no difference to the demonstrations that the elements of this termination petition have been clearly and convincingly proven. Mother has, however, clearly demonstrated an ability to communicate with and respond to her own counsel including use of the postal service to do so.

Appellant's Appendix at 24.

23

We also observe that Mother repeatedly failed to appear at court hearings which further frustrated the efforts of HCDCS to effect a reunification of Mother with X.M. First, on March 12, 2012, prior to the filing of the termination petition, the court held a review hearing in the CHINS matter and Mother failed to appear. As a result, the court issued an order approving the proposed permanency plan to terminate the parent-child relationship and noted in the order various failures on Mother's part to comply with the case plan, including failing to participate in home-based therapy, failing to complete a mental health evaluation, failing to communicate with HCDCS and other service providers, and repeatedly missing visitation sessions. Also, on September 10, 2012, the court held a hearing on Mother's Motion for Review of Permanency Plan, and Mother again failed to appear. Then, Mother failed to appear at the second day of the fact-finding hearing in the termination proceeding. Mother's counsel advised to the court that she corresponded with Mother and received correspondence back from Mother, and that Mother "has or should have had knowledge of today's date with the correspondence," and she speculated that Mother was "just withdrawing from the particular issues at hand . . . ." Transcript at 79. Such failures to appear reflect ambivalence on Mother's part. B.D.J., 728 N.E.2d at 201 ("A parent's failure to appear for assessments and court hearings reflects ambivalence . . . .").

Despite the fact that Mother's arguments fail, we examine whether the court's judgment is clearly erroneous. First, regarding 4(b)(2)(B), as noted above it is written in the disjunctive and thus we may affirm the court's judgment based upon either clause (i) or (ii). In that regard, we limit our review to clause (i), that is, whether HCDCS

24

presented clear and convincing evidence establishing that there is a reasonable probability that the conditions leading to the removal and continued placement of X.M. outside Mother's care will not be remedied, and that accordingly the court's judgment is not clearly erroneous.

In its termination order, in addition to reciting detailed findings regarding the specific testimony of Gibson, T.G., Hartman, Dickerson, and Parker, the court entered the following as Finding 16 summarizing the evidence presented demonstrating that the conditions leading to X.M.'s removal and continued placement outside of Mother's care will not be remedied as follows:

> [Mother] has failed to remedy her parenting deficits through participation in reunification services. Multiple referrals for home-based therapy and case management, as well as mental health or psychological evaluations, have all been unsuccessfully closed due to [Mother's] failure to maintain any kind of long term participation. [She] has demonstrated an ability to participate for up to two months consecutively, and to take part in intake meetings, but has failed to change her position or attitude about the conditions leading to the removal of the child from her care. [She] has specifically re-iterated that she would continue to discipline the child in the manner that led to the original removal of the child (beating the child about the arms and torso with a belt), after multiple counseling sessions to get her to discipline in another way. [Mother] is not capable of providing food, care, shelter, or basic necessities for herself or the child on a long term basis. [She] has now failed to have participation in any CHINS or termination proceedings since July 23, 2012. [She] has not made serious efforts to maintain contact with the child. . . .

Appellant's Appendix at 23.

## DECISION

Our review of the record reveals that clear and convincing evidence supports the trial court's findings detailed above. As noted above, Hartman, Gibson, and Dickerson all testified extensively regarding Mother's repeated failures to engage in services or

25

maintain contact with both HCDCS and service providers. Hartman specifically noted in her testimony that Mother was engaged and motivated to work toward her goals when they first began working together and that Mother initially attended her appointments, but a few months into the process she began to miss them, and, by late November, she had stopped attending her appointments and returning phone calls. HCDCS and LifeSolutions made repeated attempts to have Mother obtain a psychological evaluation, but Mother consistently resisted these efforts, noting that "she was afraid that they would tell her that she was dumb or that they would use the information to not let her have her kids back." Transcript at 147-148. Also, on October 21, 2011, after receiving services for two months, Mother stated to Hartman her belief that the reason why X.M. and P.B. had been removed was due to their behavior and not Mother's actions, and Mother indicated that, given the same circumstances, she would discipline her children in the same manner.

Gibson testified that, to her knowledge, Mother was not employed at the time of the termination hearing. T.G. testified that he brought Mother food in March or April of 2012 when she informed him that she did not have any food in her home. T.G. testified that Mother had consistently failed to visit X.M. at his home despite the fact that he had an open door policy for Mother to visit at her choosing, and he estimated that Mother phoned X.M. less than once per month, usually doing so in advance of a court date. T.G. also testified regarding his opinion, based upon his twelve years of experience knowing Mother, that she "understands everything" and that "[a]ll this is a joke and a game to her." Id. at 94. We also note that, as discussed above, Mother failed to appear at

26

numerous court proceedings in both the CHINS and termination matters. See B.D.J., 728 N.E.2d at 201 (noting that "[a] parent's failure to appear for assessments and court hearings reflects ambivalence, and the failure to attend parenting classes reflects an unwillingness to change existing conditions").

Second, we examine whether the court's determination that termination of Mother's parental rights is in the best interest of X.M. is not clearly erroneous. We observe that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

The court recited the following in Finding 20 of its termination order regarding the best interest of X.M.:

> The child has resided with and been raised by [T.G.] for approximately the last twelve (12) months. [X.M.] has established a strong and loving bond with [T.G.], who has a reciprocal bond with the child. The child is an integral part of that family. [X.M.] is not subjected to physical abuse or inappropriate discipline, neglect, abandonment, deprivation, lack of supervision, or lack of provision of his basic necessities while in this placement, which he had been subjected to, and would continue to be subjected to if the parent-child relationship continues. . . .

27

Appellant's Appendix at 24.

At the termination hearing, Gibson testified that T.G. maintains a clean and appropriate home and "is very in tune with what [X.M.'s] needs are pertaining to his disability. He's very nurturing. There's a definite bond." Transcript at 38. She testified that T.G. wants to adopt X.M., that X.M. wants to be adopted by T.G. and calls him daddy, that X.M. is very attached to J.G., and that it would be in X.M.'s best interest to proceed with the permanency plan. Parker testified that it was in X.M.'s best interest to remain with T.G., noting that X.M. was very strongly attached to his half-sister, J.G. Dickerson testified that he did not have concerns with T.G.'s household and was impressed with T.G., and that it would be in X.M.'s best interests to stay with T.G. The recommendations of Gibson, Parker, and Dickerson, coupled with our analysis under subparagraph 4(b)(2)(B), is sufficient to prove by clear and convincing evidence that termination is in X.M.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

In addition, T.G. testified that he has known X.M. since X.M. was two years old. He noted that, in the time X.M. has been living with T.G., X.M. "now has some pride" in himself, loves going to school and is a straight A student, and is working on his speech, noting that before X.M. would not try to speak and would instead make animal noises. Id. at 90. X.M. also is enrolled in a boxing self-defense class which he enjoys. T.G. was

asked about the progress X.M. has made and whether it would continue if he were returned to Mother, and T.G. stated that the progress "would decline just like that" because Mother would "not do anything to try to keep the progress going." Id. at 103. T.G. also stated that he was employed by the Amazon Distribution Center and that he was able to provide for all of X.M.'s necessities.

After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings addressing the requirements of Ind. Code §§ 31-35-2-4(b)(2)(B) and 4(b)(2)(C). These findings, in turn, provide ample evidence to support the trial court's ultimate decision to terminate Mother's parental rights to X.M. This court will reverse a termination of parental rights "only upon a showing of 'clear error' – that which leaves us with a definite and firm conviction that a mistake has been made." Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here. Finally, Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

CONCLUSION

For the foregoing reasons, we affirm the trial court's involuntary termination of Mother's parental rights to her child, X.M.

Affirmed.

RILEY, J., and BRADFORD, J., concur.

29