## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

E.B. (a Minor Child)

and

B.H. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

August 20, 2015

Court of Appeals Case No.
21A01-1501-JT-37

Appeal from the Fayette Circuit Court

The Honorable Beth A. Butsch, Judge

Trial Court Cause No.
21C01-1409-JT-221

**Mathias, Judge.**

The Fayette Circuit Court terminated the parental rights of B.H. to his daughter, E.B. B.H. appeals and presents one issue, which we restate as: whether sufficient evidence exists to support the trial court's decision.

We affirm.

## Facts and Procedural History

E.B. was born on April 13, 2013, to J.B. ("Mother"). Staff at the hospital where E.B. was born reported to the Department of Child Services ("DCS") that E.B. had been exposed to illicit drugs *in utero*. Specifically, E.B. had minor withdrawal symptoms, but these symptoms were not sufficiently severe to warrant further hospitalization. Mother and E.B. were then released two days after the birth. Still, DCS continued to monitor E.B.'s status and attempted to convince Mother to engage in services. However, Mother's participation was sporadic.

Less than a month after the birth, DCS received a report indicating that Mother was using heroin. DCS and police went to Mother's apartment to investigate this report and found Mother unconscious with E.B. in her arms. Mother had needle marks in both of her arms, and it was difficult for the police to rouse her from sleep. Mother was arrested for possession and child neglect, and DCS took custody of E.B. The child was eventually placed in relative foster care. E.B. was found to be a child in need of services ("CHINS") on July 2, 2013, upon Mother's admission to the allegations.

During the CHINS proceedings, Mother named J.T. as E.B.'s father, but subsequent DNA testing excluded him as the father. Mother then named two other men who could possibly be E.B.'s father, one of whom was B.H.[1] DCS attempted to contact B.H. and made contact with him on May 31, 2013, to inform him that he could be E.B.'s father. B.H. told the DCS caseworker that he did not want to establish paternity through DCS, stating that "he did not want to take part in any CHINS proceeding or go through DCS or the Fayette County courts." Tr. pp. 37, 54. Father told the caseworker that he would obtain an attorney and obtain custody of E.B. and that she would hear from either him or his attorney regarding the matter. However, B.H. never contacted DCS either personally or through an attorney. B.H. later admitted that he knew as early as two months prior to E.B.'s birth that he could be the father, but he never sought to establish paternity or attempt to help raise and care for the child.

---

[1] B.H. was no stranger to DCS. In 2001, DCS investigated B.H. after discovering burns and scalding on his three-year-old son. No case was opened at that time because the family received assistance through Medicaid. DCS investigated B.H. again in 2011 after receiving reports that Father was physically abusing his children. The reports were substantiated, the children were removed from B.H.'s custody, and DCS started CHINS proceedings. The allegations against B.H. included: he placed a belt around the head and neck of one of his children; he picked up one child by the neck and slapped and punched him; he gave one child a black eye; he threatened physical harm to the children if they reported the abuse; he verbally abused the children, calling them "assholes, sluts, retards, and stupid"; and he and his girlfriend used illicit drugs. Ex. Vol., Exs. B – C; Tr. pp. 12-14, 16. During this investigation, B.H. was aggressive toward DCS caseworkers. Accordingly, DCS required the presence of police when they spoke with B.H. The children were determined to be CHINS on January 17, 2012. B.H. did not cooperate or comply with the offered services, and certain service providers would not work for him due to his hostility. B.H. would not even tell DCS were he lived, claiming that he lived "under a bridge." Tr. pp. 28-29. The children's mother eventually obtained custody in divorce proceedings, and B.H. was not allowed to visit the children unless he participated in therapy.

[6] DCS contacted B.H. again on June 21, 2013, after not having heard from either him or his attorney. DCS asked B.H. for his address so that he could be summoned for paternity testing. B.H. claimed to be homeless and refused to cooperate with the caseworker. The caseworker eventually found B.H.'s address in a database, and a summons was issued to B.H. on July 2, 2013, to submit to paternity testing. The summons was returned as undeliverable.

[7] Eventually, DCS learned that B.H. was incarcerated in the Fayette County jail. DCS served the summons for paternity testing on B.H. in jail. On November 19, 2013, the DNA paternity test revealed a 99.9% probability that B.H. was E.B.'s biological father.

[8] After the paternity test, DCS amended the existing CHINS petition to include B.H. The trial court held a fact-finding hearing on February 3, 2014, and found: (1) that Mother admitted to the CHINS allegations; that B.H. was not living with Mother or E.B. and, at the time of the filing of the initial petition, was not alleged to be E.B.'s father; that DCS notified B.H. in June 2013 that he was possibly E.B.'s father; that B.H. did not attempt to establish paternity until DCS located him in jail in November 2013; and that B.H. was in jail awaiting trial on a charge of Class A felony dealing in a controlled substance within 1,000 feet of a public school.

[9] The trial court ordered B.H. to notify DCS within forty-eight hours of his release from jail so that his parental participation order could be modified to reflect the services he would be required to complete. As of the date of the

termination order on appeal in this case, B.H. was never released from incarceration. At an August 1, 2014, case review hearing, the trial court found that B.H. had been uncooperative with DCS since his incarceration. At the November 5, 2014 review hearing, the trial court noted that the permanency plan for E.B. was adoption.

DCS filed a petition to terminate B.H.'s parental rights on September 29, 2014. The trial court held a hearing on the petition on December 8, 2014. At the end of the evidentiary hearing, the trial court took the matter under advisement and on December 31, 2014, entered an order terminating B.H.'s parental rights to E.B. B.H. now appeals.

## Standard of Review

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child[]'s interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Indiana Code section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

> (2) The petition must allege:
>> (B) that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[13]    Section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, the trial court is required to find that only one prong of subsection 2(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. Clear and convincing evidence need not establish that the continued custody of the parents is wholly inadequate for the child's very survival. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Rather, it is sufficient to show by clear and convincing evidence that the child's emotional development and physical development are put at risk by the parent's custody. *Id.* If the court finds that the allegations in a petition are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[14]    On appeal, we have a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct.

App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence favorable to the trial court's judgment and the reasonable inferences to be drawn from this evidence. *Id*. Where, as here, the trial court enters findings of fact and conclusions of law in its termination of parental rights,[2] we apply a two-tiered standard of review. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings; we then determine whether the findings support the judgment. *Id*. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *Id*. Likewise, we will set aside the trial court's judgment terminating a parent-child relationship only if it is "clearly erroneous." *Id*. In this context, "clear error" is that which "leaves us with a definite and firm conviction that a mistake has been made." *Id*. (quoting *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004)).

## Discussion and Decision

[15] B.H. argues on appeal that the trial court clearly erred in finding that the conditions that led to the removal of the child would not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being

---

[2] Although trial courts are not statutorily required to enter findings of fact and conclusions of law when terminating parental rights, we have nevertheless held that, given the constitutional import of such a decision, trial courts *must* "enter findings of fact that support the entry of the conclusions called for by Indiana statute and the common law" when issuing an order terminating parental rights. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

of the child. He also argues that the trial court clearly erred in finding that termination of the parent-child relationship was in E.B.'s best interests.[3] We address these arguments in turn.

*A. Conditions Which Led to the Removal of the Child*

On appeal, B.H. first claims that evidence was insufficient to support the trial court's conclusion that a reasonable probability exists that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(i).

When making a determination as to whether a reasonable probability exists that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d at 1156-57. The trial court is also required to consider the parent's habitual patterns of conduct in order to determine the probability of future neglect or deprivation of the child. *Id.* at 1157. The trial court may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may also consider the services offered to the parent by DCS and the parent's

---

[3] Father does not challenge the validity of any of the trial court's findings of fact, nor does he claim that DCS failed to meet the requirement of Section 4(b)(2)(A) that the child was removed from the parents for the requisite period of time, or the requirement of Section 4(b)(2)(D) that a satisfactory plan for the care and treatment of the child is in place.

response to those services as evidence of whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead, it needs to establish only a "reasonable probability" exists that the parent's behavior will not change. *Id.*

[18] In the present case, the conditions which led to the removal of E.B. were Mother's substance abuse and neglect of the child. Although no evidence indicates that B.H. was the cause of Mother's substance abuse and neglect, the fact remains that B.H. did nothing to establish paternity, gain custody or visitation, or attempt to alleviate the conditions which led to E.B.'s removal, despite the fact that B.H. knew months before E.B. was born that he was possibly the child's biological father. Instead, after E.B. was removed from Mother's custody, B.H. did nothing. Indeed, B.H. only became involved in the CHINS proceedings after he was incarcerated awaiting trial, when DCS finally located him and served him with the summons requiring him to undergo a paternity test. Clearly, B.H.'s behavior is not that of a concerned father attempting to take care of his infant child. Under the present facts, clear and convincing evidence exists that the conditions that led to E.B.'s removal would not be remedied.

*B. Continuation of the Parent-Child Relationship Poses a Threat to the Well-being of the Child.*

[19] As noted above, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Accordingly, the trial court is required to find that only one prong of subsection 2(b)(2)(B)—that the conditions which led to the child's removal

will not be remedied, that the continuation of the parent-child relationship poses a threat to the well-being of the child, *or* that the child has been adjudicated a CHINS on two separate occasions—has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d at 220. Still, because B.H. challenges the trial court's findings under both subsections 2(b)(2)(B)(1) and (2), we address both arguments.

[20] When reviewing the question of whether continuation of the parent-child relationship poses a threat to the child's well-being, termination is proper when the evidence shows that the emotional and physical development of a child is threatened. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 94 (Ind. Ct. App. 2014). We repeat that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired. *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006).

[21] Here, E.B. was born with drug withdrawal symptoms. A few days later, she was found in the arms of her mother, who was unconscious and under the influence of illicit drugs. Despite having been told months before that he was possibly the child's father, B.H. did nothing to establish his paternity or attempt to check on the welfare of E.B. When E.B. was removed from Mother's care and DCS contacted B.H. to inform him that he was possibly E.B.'s father, he was non-cooperative and refused to provide an address so that he could be summoned for the paternity test. It was not until B.H. was jailed and awaiting trial on Class A felony drug charges that DCS was finally able to track him

down and establish his paternity of E.B. Due to his incarceration, B.H. was unable to participate in services offered by DCS. To accept B.H.'s current position would have us let E.B. linger in foster care for an indefinite period until B.H. is released from incarceration.[4] Under these facts and circumstances, we cannot say that the trial court clearly erred in determining that continuation of the parent-child relationship posed a threat to the well-being of E.B.

*C. Best Interests of the Child*

[22] B.H. also contests as clearly erroneous the trial court's conclusion that termination of the parent-child relationship was in the best interests of the child. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by the DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, a recommendation by both the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-

---

[4] At the time of the termination hearing, B.H. was incarcerated awaiting trial. Although it forms no basis for our decision in this matter, we cannot ignore that, as a matter of public record, B.H. pleaded guilty on May 1, 2015, to the lesser-included offense of Class C felony possession of a controlled substance and was sentenced to eight years incarceration. *See* Chronological Case Summary, *State v. B.H.*, No. 21C01-1310-FA-0769, available at: http://mycase.in.gov/. Although we are not to consider matters outside the Record on Appeal, *see B.J.B. v. State,* 805 N.E.2d 870, 875 (Ind. Ct. App. 2002), we may take judicial notice of records of a court of this State. *See* Ind. Evidence Rule 201(a)(2)(C), (b)(5).

59. Permanency is a central consideration in determining the best interests of a child. *Id*. at 1159.

[23] Here, sufficient evidence supports the trial court's conclusion that the termination of B.H.'s parental rights was in E.B.'s best interests. B.H. had no contact with E.B. after her birth even though he knew he could be the child's father, nor did he seek to establish his paternity; to the contrary, when approached by DCS with regard to establishing paternity, B.H. was resistant and did not undergo paternity testing until he was incarcerated and could no longer avoid DCS. Even after the child had been removed from Mother, B.H. did not seek any contact or attempt to establish his paternity so that he could raise and support his child. Instead, he let her remain in foster care. The trial court also rightly considered the fact that B.H. was incarcerated and would remain so in the immediate future. Thus, termination of B.H.'s parental rights would help E.B. achieve permanency.

### D. B.H.'s Incarceration

[24] The brunt of B.H.'s argument on appeal is not specifically directed at the statutory elements required to terminate his parental rights to E.B. Instead, he complains that the trial court terminated his rights without offering him services because of his incarceration. In support of his argument, B.H. relies on several cases.

[25] The first of these is *In re J.M.*, 908 N.E.2d 191 (Ind. 2009). In that case, however, our supreme court affirmed the trial court's *denial* of DCS's petition to

terminate the parental rights of the mother and father, both of whom were incarcerated. Thus, the court was applying the highly deferential standard of review in termination cases to affirm the trial court. In contrast, the trial court here *granted* the petition to terminate B.H.'s parental rights, and our standard of review weighs in favor of affirming the trial court, not reversing it. Furthermore, in *J.M.*, the parents had an existing relationship with their children which they had maintained during their incarceration. *Id.* at 195. In contrast to the present case, the release dates of the parents in *J.M.* was relatively close. Thus, the trial court properly concluded that termination of the parent-child relationship was not appropriate in that case. *See id.*

[26]    The same is true regarding B.H.'s citation to *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009). In that case, the mother had been the sole caregiver to her child for almost two years after his birth. The mother was then arrested and ultimately pleaded guilty to Class B felony dealing in cocaine. Almost immediately after her arrest, the mother attempted to find relative care for her child. When these attempts failed, the State filed a CHINS petition, and the trial court determined the child to be a CHINS. A year later, DCS filed a petition to terminate the mother's parental rights, which the trial court granted. Although this court affirmed, our supreme court granted transfer and reversed the trial court's determination. In so doing, the court noted that, prior to her arrest, no evidence indicated that she was anything other than a fit parent. *Id.* at 1262. The mother participated in a drug rehabilitation program in prison and also took a parenting class. *Id.* Further, the mother's release date was projected to be June 2009 and

could possibly have been in May of that year. *Id.* The mother also made good-faith efforts to complete the required services available to her in prison. Perhaps most importantly, despite her incarceration, the mother had maintained a consistent, positive relationship with her child. *Id.* at 1264. With regard to concerns of permanency in the child's life, the court noted that the child was young and the mother's release from incarceration was "imminent." *Id.* at 1265. Under those circumstances, the court in *G.Y.* held that termination was unwarranted. *Id.* at 1265-66.

[27] The present case is distinguishable in several ways. First and foremost, the mother in *G.Y.* had an existing relationship with her child and maintained this relationship despite her incarceration. In contrast, B.H. never sought out contact with E.B. despite knowing before the child's birth that he was possibly her father. Even after the child was removed from her drug-addicted mother and placed in foster care, B.H. did not seek to help the child and was even non-cooperative with DCS's attempts to establish his paternity of E.B. Only when he was incarcerated did B.H. agree to undergo paternity testing. Also unlike the mother in *G.Y.*, the evidence before the court in this case was that B.H. had not been a reliably fit parent in the past with his other children. *See In re A.L.H.*, 774 N.E.2d 896, 899 (Ind. Ct. App. 2002) (noting that a trial court may properly consider evidence of a parent's prior history of neglect in deciding whether to terminate parental rights).

[28] B.H.'s citation to *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006), *trans. denied*, is also unavailing. In

*Rowlett*, the children were removed from their mother due to the mother's neglect. The father, Rowlett, then attempted to establish his paternity and gain custody of the children. Before he could do so, however, he was arrested and charged with dealing in methamphetamine. Although Rowlett did not participate in any services due to his incarceration, he had not used drugs since his incarceration, he participated in nearly 1,100 hours of individual and group services, he had earned twelve hours of college credit and planned on attending college after his release, and he had secured employment after his release. *Id.* at 622. Further, while in prison, he maintained contact with the children. Perhaps most importantly, the termination hearing occurred only six weeks prior to Rowlett's release from incarceration. *Id.* Under those facts and circumstances, the *Rowlett* court held that termination was improper. *Id.* at 623-24.

[29] Here, however, B.H. made no effort to establish his paternity or assist in raising E.B. at any time prior to the CHINS proceedings. Even after the CHINS proceedings were initiated, B.H. was resistant to the efforts of DCS to establish his paternity. He also has not demonstrated the sort of improvement shown in *Rowlett*, and his release from incarceration was, at the time of the termination hearing, uncertain.

[30] With regard to B.H.'s complaint that DCS did not offer him services due to his incarceration, this is not a reason to reverse the trial court. DCS is not required to offer services to a parent to correct deficiencies in the parent's ability to care for his or her child. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Although a participation plan serves as a useful tool in assisting parents in

meeting their obligations and DCS routinely offers various services to parents to assist them in regaining custody of their children, termination of parental rights may occur independently of these services, as long as the elements of Indiana Code section 31-35-2-4 are proven by clear and convincing evidence. *Id*; *see also Rowlett*, 841 N.E.2d at 622 (noting that State was not required to provide an incarcerated father with services).

## Conclusion

Applying our highly deferential standard of review, we are unable to say that the trial court's decision to terminate B.H.'s parental rights was clearly erroneous.

Affirmed.

Baker, J., and Bailey, J., concur.