# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 30 2019, 8:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey S. Arnold
Columbia City, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

K.B. (Minor Child)

and

K.Y. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 30, 2019

Court of Appeals Case No. 19A-JT-687

Appeal from the Whitley Circuit Court

The Honorable Matthew J. Rentschler, Judge

Trial Court Cause No. 92C01-1809-JT-54

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, K.Y. (Mother), appeals the termination of her parental rights to her minor child, K.B. (Child).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Department of Child Services (DCS) presented clear and convincing evidence to support the trial court's termination of Mother's parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother is the mother of Child, born on September 17, 2012. Mother and Child initially became involved with DCS in October 2014, when Child was removed from Mother's care because Mother's roommate was manufacturing methamphetamine in the apartment. DCS filed a Child in Need of Services (CHINS) petition whereupon Child was placed with K.B., the Child's biological father (Father). [1] Mother agreed to sign custody of the Child over to Father and the case was dismissed a few months later.

---

[1] The trial court also terminated Father's rights to his Child, but he did not appeal the decision. Facts pertaining to Father will be included if necessary for this appeal.

[5]     Mother and Father did not remain separated. On March 24, 2017, DCS received a report of a domestic altercation between Mother and Father, during which Mother left the residence intoxicated, and took the Child with her. Family Case Manager, Monica Straight (FCM Straight), visited with both Mother and Father. The Child was not removed at that time and DCS offered the family an informal adjustment whereby Mother and Father were allowed to retain custody of the Child under certain conditions.

[6]     In June 2017, DCS received a report of suspected drug use in Mother's residence. During the investigation of the report, DCS learned that Mother had left Child with a caregiver for more than eighteen hours and was unable to get the Child because she was "with another male who was under the influence." (Transcript p. 98). When Mother returned, she left the county with the Child and their whereabouts were unknown for two and one-half days. Eventually, FCM Straight located Mother and Child in Milford, Indiana, and initiated an unplanned visit. Confronted by FCM Straight, Mother refused to take a drug test, which refusal was in violation of the terms of her informal adjustment, and DCS detained the Child.

[7]     On June 29, 2017, DCS filed an affidavit of probable cause, alleging the Child to be a CHINS. That same day, the trial court conducted an emergency detention hearing and upheld the Child's detention, placing him with his paternal grandparents. At a hearing conducted on July 31, 2017, Father admitted that Child was a CHINS, and Mother admitted likewise during a hearing on August 21, 2017. As part of the dispositional order, Child's parents

were required to participate in services, including, among others, maintain suitable, safe, and stable housing, secure and maintain employment, not consume alcohol or illegal substances, complete a parenting assessment and all recommendations therefrom, and complete substance abuse treatment. Child was eventually removed from his placement with paternal grandparents because of suspected sexual abuse by grandfather. On January 5, 2018, Child was placed with a foster care provider in Columbia City, Indiana.

[8] Dawn Scott (Scott), a licensed clinical therapist, specializing in addiction, worked with both Mother and Father starting in May 2017. The therapy involved "domestic violence, relationship issues and other underlying issues." (Tr. p. 25). During the approximately one year he counseled Mother, they met about forty times. Nevertheless, Mother was not successful as she "wasn't engaging [in] treatment recommendations" and continued using drugs. (Tr. p. 27). Mother and Father had a toxic relationship and even though they separated numerous times during Scott's involvement with the parents, when they were together, Mother would relapse.

[9] DCS offered home-based services to Mother and referred her for a substance abuse assessment, a parenting assessment, and a psychological assessment. She was inconsistent in complying with the services and failed to maintain contact with DCS. Upon DCS's referral, Mother and Child entered into therapy sessions at the Villages of Indiana with therapist Jennifer Lawson. After a single meeting, Mother failed to attend any follow-up visits. In June of 2018,

Mother's visits with the Child were suspended due to Mother's inconsistency with services and her failure to maintain contact with DCS.

[10] During the course of the CHINS proceedings, Mother was mostly transient and resided in approximately twenty different locations: homeless shelters, residential treatment centers, hospitals, jails, and a car. At times, DCS attempted to move the services to the different places where Mother was located. DCS was not always successful as Mother moved often and her whereabouts were unknown on many occasions.

[11] Mother resided at Noble House Ministries, a homeless shelter, domestic violence shelter and a recovery home on three different times. In March 2015, she was evicted after approximately one month for a curfew violation. In November 2017, Mother was evicted after two weeks because she failed to return after receiving a pass. In October 2018, Mother was evicted for intoxication.

[12] From November 30, 2017 though March 3, 2018, Mother lived at Charis House, a homeless shelter for women and children. Although Mother was given a lot of leniency with the house rules, she was nevertheless evicted because she falsely asserted that she needed to go to the hospital because of a head injury. In April and May of 2018, Mother resided at Serenity House, a transitional living facility for men and women in Auburn, Indiana. She left on her own, and her exit was deemed unsuccessful.

[13]     In early 2018, Mother was arrested for possession of methamphetamine and paraphernalia. She was subsequently charged with Level 6 felony nonsupport of a dependent. Mother entered the Noble County drug court in October 2018. On her first day, Mother tested positive for alcohol. During the following days, Mother tested positive for alcohol and Xanax. The trial court issued a warrant and Mother was taken into custody on October 15, 2018. She remained in jail until November 26, 2018.

[14]     After being placed with B.E., a foster care provider in Columbia City, Indiana, the Child's behavior improved drastically. Prior to his placement, Child was very temperamental. He went from "a little kid who was screaming and running around [FCM Straight's] office cussing and throwing a fit, to a kid who is learning to control his emotions." (Tr. p. 116). He is now learning to swim and ride a bike, and is proud of his accomplishments. He fits in well with his foster family, calling his foster parents mama and papa, and acting as a sibling to the other children in the house. Child's Court Appointed Special Advocate (CASA) David Lowe (CASA Lowe) visited the Child at his grandparents' residence, at school, and at his foster parents' placement. While Child was initially a "wild child," CASA Lowe has seen a complete turnaround in his behavior (Tr. p. 128). He is now a "loving little boy," he fits in well with his classmates, and he is a "good kid all the way around." (Tr. p. 128). After receiving therapy, Child now knows boundaries and is respectful of other people's things. He needs stability, structure and predictability, which is offered by his foster parents, who intend to adopt her.

[15]     DCS filed its petition for termination of Mother's parental rights on September, 25, 2018. On November 26, 2018, after DCS filed its termination petition, Mother entered Rose Home, a facility that helps women in recovery. When Mother first applied, she was incarcerated but after a successful interview, Mother was admitted. Mother only became compliant with DCS' s services when she entered Rose Home at the end of November 2018. At the time of the termination hearing, Mother was on home detention with an ankle monitor because of a drug related conviction. She was still on probation for her drug case and faced a felony non-support of dependent charge. At the hearing, FCM Straight opined that returning the Child to Mother would be a regression, and detrimental to his mental and physical health.

[16]     On March 1, 2019, the trial court issued its Order, terminating Mother's parental rights to her Child and concluding, in pertinent part, that there is a reasonable probability that the conditions that resulted in the Child's removal or the reasons for placement outside the home of the parents will not be remedied, and there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Child. Finding termination in the best interests of the Child, the trial court terminated the Mother-Child relationship.

[17]     Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### A. *Standard of Review*

Mother challenges the termination of her parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that

support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

### B. *Termination of Parental Rights Statute*

[20] In order to terminate a parent's rights to his child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.* On appeal, Mother does not challenge the trial court's finding that the Child has been removed from the home for the requisite period of time, that there is a satisfactory plan for the care and treatment of the Child, or that termination of her parental rights is in the best interests of the Child.

### C. *Conditions have not been remedied*[2]

[21] Mother claims that there is insufficient evidence to support the trial court's determination that the conditions which resulted in the removal of the Child have not been remedied. It is well established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment.

---

[2] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. In this case, the trial court based its termination decision on DCS's satisfaction of Indiana Code section 31-35-2-4(b)(2)(B)(i) & (ii)—that the conditions that resulted in the Child's removal has not been remedied and the continuation of the parent-child relationship posed a threat to the Child's well-being. Because Mother fails to challenge the trial court's conclusion that a continued parent-child relationship would pose a threat to the Child, DCS satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B). Nevertheless, because of the important rights at stake, we will address Mother's argument.

*McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id*. Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[22]     In support of her argument that the conditions which resulted in the removal of the Child have been remedied, Mother refers to her change in behavior, starting in November 2018 through the date of trial in February 2019, which coincided with her entry in the drug court program and residency at Rose Home. She claims to now have stable housing, to be substance free, and to have engaged in meaningful counseling.

[23]     At the end of June 2017, DCS removed the Child from Mother's care because of the domestic abuse with Father, Mother's alcohol and substance abuse, and her neglect of the Child. During the next sixteen months, Mother failed to undertake any steps towards the reunification with Child. She did not address

her alcohol and drug addiction, she was inconsistent with services, and failed to maintain contact with DCS. In June 2018, Mother's visits with Child were suspended due to her failure to complete services and remain in contact with DCS. During the pendency of the CHINS and termination proceedings, Mother was transient and lived in different homeless shelters and half-way houses. She was frequently evicted from the shelters due to noncompliance with the rules.

[24] While we agree with Mother that her behavior improved after she entered the drug court program and took up residency at Rose Home, we also note that this change occurred after DCS filed its petition for termination of her parental rights to the Child. Nonetheless, on her first day with the drug court program, Mother tested positive for alcohol, and on subsequent days, she tested positive for alcohol and Xanax. Mother was arrested and remained in jail from October 15, 2018 until she entered Rose Home on November 26, 2018. At Rose Home, Mother finally started complying with the drug court and the home's rules.

[25] Although Mother's recent compliance is commendable, it only commenced one-and-one-half year after DCS instituted the informal adjustment and after the agency filed its termination petition. At the termination hearing, FCM Straight observed that Mother's habitual pattern consists of entering a facility where she initially would do well but subsequently become noncompliant and would leave the program without completing it successfully. Although FCM Straight credited Mother for her progress at Rose Home, she also advised that Mother had an ankle monitor and an incentive to follow her programs because

otherwise she would be required to serve thirty months in prison. Furthermore, while Mother acknowledges that her marriage to Father is abusive and violent—and a factor in DCS's detainment of the Child—Mother was still married to him at the time of the termination hearing. The last time the parents talked, Mother initiated the contact with Father because she missed him. Even though Mother testified that she was going to divorce Father and had collected the paperwork, she advised that she would file for divorce when she "figure[d] out how to fill it out and file it." (Tr. p. 135).

[26] A trial court is "within its discretion to 'disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts.'" *K.T.K.*, 989 N.E.2d at 1234. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Mindful of this guideline, the trial court observed in its Order, that "[d]espite Mother's recent progress, and in light of the overall record of tremendous volatility, the [c]ourt is deeply skeptical of Mother's ability to turn her recent successes into long-term stability for" the Child. (Appellant's App. p. 32). Here, the evidence presented clearly and convincingly shows a reasonable probability exists that the conditions that led to the Child's removal from Mother's care will not be remedied. Mother's recent turnaround in behavior and compliance with DCS's services must be evaluated in light of a threat of thirty months of incarceration and a highly leveraged and supervised existence by the drug court and Rose Home for

Mother to attain this change. There is no plan, nor even a semblance thereof, in place for Mother after her residency at Rose Home comes to an end and she is faced with the pressures of everyday life and the responsibility of maintaining a household. Accordingly, we find that the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Child's removal from Mother's care will not be remedied was not clearly erroneous.

# CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's Order terminating Mother's parental rights to the Child.

Vaidik, C. J. and Bradford, J. concur